**UNITED STATES of America, Appellee,**

v.

**Wallace Andre JACKSON, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Vaniel GRAHAM, Appellant.**

Nos. 94–3381, 94–3639.

United States Court of Appeals,
Eighth Circuit.

Submitted March 14, 1995.

Decided Oct. 13, 1995.

Jams E. Bobenhouse, Cedar Rapids, Iowa, argued, for the appellant Vaniel Graham.

Robert Teig, Cedar Rapids, Iowa, argued (Richard L. Murphy, Cedar Rapids, Iowa, on the brief), for the appellee.

Before MAGILL, HEANEY, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

HEANEY, Circuit Judge.

These appeals arise from an investigation into a drug distribution conspiracy centered in Clinton, Iowa. Appellant Wallace Andre Jackson was tried and convicted of conspiracy and appeals both his conviction and his sentence. Appellant Vaniel Graham pleaded guilty to witness intimidation and firearms charges and now appeals the imposition of an increase in his sentencing offense level for obstruction of justice.

## I. Wallace Andre Jackson

Wallace Andre Jackson was charged with conspiracy to distribute and possess with intent to distribute cocaine base ("crack cocaine") between February 1991 and January 1994. A jury convicted Jackson on September 21, 1994.

The facts adduced at trial, taken in the light most favorable to the prosecution, *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), indicate that Jackson was at the center of a small-scale drug distribution network based in Clinton, Iowa. Most of the testimony incriminating Jackson was given by co-conspirators who had agreed to plead guilty to drug trafficking charges. Among those who testified were Moses Jackson, a nephew of the defendant; Katherine Vazquez Guadalupe, a former girlfriend of the defendant; Daman Julian, a friend of the defendant; and Rhonda Morris, a former housemate of the defendant.

For the purposes of this appeal, the essential elements of their testimony can be summarized as follows. Moses Jackson stated that he sold crack cocaine for the defendant, and that he made trips on the defendant's behalf from Clinton to Chicago to obtain powder cocaine from a source there. Moses testified that he observed several others, including Daman Julian, Jack Evans, Mike Peters, and Keith Peters, selling crack cocaine in conjunction with the defendant. Moses explained that he, the defendant, and others would convert the powder cocaine to crack cocaine, "dice it up," and bag it for resale. Katherine Vazquez testified that she assisted the defendant with the transportation of cocaine from Chicago to Clinton and that the defendant provided the funds for vehicle rental. Vazquez, Jack Evans, and Daman Julian all testified that they sold crack cocaine for the defendant out of an apartment located at 205½ Second Avenue South in Clinton.

In addition, testimony was given by several law enforcement officers who had executed search warrants during the period from 1991 to 1994. The police executed one such warrant on February 12, 1993, at 205½ Second Avenue South, then occupied by Wallace Jackson. The police had been informed by the landlord that there had been an unusual amount of traffic in and out of the apartment. In the course of the search, police officers found the defendant and his brother in the living room along with sixty small bags of crack cocaine. One officer seized $717 in cash and $114 in food stamps from the defendant's pockets. Another officer found a ledger containing what appeared to be records of drug transactions.

The ledger was later identified by Katherine Vazquez as the book she used to record

drug transactions for the defendant. Vazquez also testified that Jackson later confirmed his ownership of the drugs during a private conversation in which the defendant detailed his attempt to dispose of the crack cocaine when the police appeared at his door. In addition, the prosecution suggested at trial that Jackson's food stamps were derived from drug sales. Randy Dodson of the Iowa Department of Inspections and Appeals took the stand to state that the defendant had not received food stamps from the state of Iowa in February 1993.

Vazquez and Moses Jackson testified that after the search the defendant moved his base of operations to an apartment building known as "The Castle" located at 561 Fifth Avenue South in Clinton. Vazquez and Carrie Brown, the girlfriend of Moses Jackson, testified that the defendant took steps to protect the apartment from the police, including the installation of security locks, double doors, videocameras, and other monitoring equipment. On March 30, 1993, police executed a search warrant at that apartment. In addition to finding evidence of the security measures and an escape exit through the basement, police officers seized razor blades and plastic baggies.

Following that search, Wallace Jackson rented yet another apartment in Clinton. Vazquez testified that she and the defendant's fiancee, Patricia Peters, continued to travel to Chicago to obtain cocaine for redistribution in Clinton. Moses Jackson stated that he obtained crack cocaine from the defendant in April and May 1993 for resale in Cedar Rapids, Iowa. Moses, Vazquez, and Carrie Brown testified that the defendant and Vazquez made deliveries of crack cocaine to Moses in Cedar Rapids.

After being caught by the police in Cedar Rapids with crack cocaine and several firearms, Moses Jackson agreed to cooperate with law enforcement. On June 23, 1993, Moses telephoned the defendant and asked him to bring more crack to Cedar Rapids. Wallace Jackson agreed, but cautioned that he would not bring much because he had only "three O's." Moses testified at trial that "three O's" referred to three ounces of crack cocaine. Seeking to corroborate his claims that he obtained crack cocaine from the defendant for resale in Cedar Rapids, the police recorded several additional phone calls placed by Moses Jackson to the defendant and to Patricia Peters.

On August 5, 1993, police officers executed a search warrant at Fontane's, a clothing and hair care products store in Clinton. Wallace Jackson paid the rent for the store and served as its manager. According to Katherine Vazquez, Jackson told her that his management of the business was designed to deflect suspicion about the source of his income. Fontane's was located in the vicinity of the apartments rented by Jackson for the distribution of crack cocaine. During the search of Fontane's, police found the defendant with two loaded firearms. On the roof of the establishment, officers found two men, John Jordan and Lorenzo Dodd, with two loaded firearms. At the conclusion of the search, police arrested the defendant. On August 11, 1993, police executed a search warrant at Jackson's apartment, finding a gun case and ammunition for three of the weapons seized at Fontane's.

Other evidence presented at trial suggested that Patricia Peters, Daman Julian, Rhonda Morris, John Jordan, and others continued to distribute crack cocaine on behalf of the defendant after his incarceration on weapons charges. Julian and Morris testified that they continued to obtain crack cocaine from Peters for resale. Morris testified that Peters told her that the defendant was directing his drug distribution enterprise from the Clinton County Jail. Telephone toll records received at trial indicated that there were regular communications between a party at Patricia Peters's residence and a party at the Clinton County Jail beginning on August 5, 1993.

Wallace Jackson, Katherine Vazquez, and Daman Julian were indicted by a grand jury on November 15, 1993. At his trial, Jackson testified in his own defense. He asserted that he never distributed crack cocaine to the alleged co-conspirators who testified against him. Jackson maintained that the police had lied about finding cash on his person during their search of his apartment on February 12, 1993, and that Katherine Vazquez had left the money and crack cocaine in his apartment. Jackson stated that his mention of

"three O's" on the recorded phone conversation with Moses Jackson referred not to three ounces of crack cocaine but to three boxes of outfits that Moses Jackson was to sell on his behalf.

The jury convicted the defendant on the conspiracy count, and he was sentenced to a term of 400 months of imprisonment. On appeal, Jackson raises twelve claims, challenging both his conviction and his sentence. We address each in turn.

### A. Admissibility of Co–Conspirator Statements.

■ Jackson challenges the admission in evidence of eight statements made by co-conspirators. Jackson claims that the statements were not made in furtherance of the conspiracy, and therefore were not admissible under the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E). The burden lies on the prosecution to establish by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the disputed statement was made during and in furtherance of the conspiracy. *United States v. Morgan,* 997 F.2d 433, 436–37 (8th Cir.1993).

■ Jackson challenges the statements under the third prong of the *Morgan* test. Given that the term "in furtherance of" is to be "interpreted broadly," *United States v. Edwards,* 994 F.2d 417, 422 (8th Cir.1993), and that "[s]tatements are admissible under 801(d)(2)(E) if the overall effect of the conversation is to facilitate the conspiracy," *id.,* we find no abuse of discretion in the district court's determination that each of the statements was made during and in furtherance of the conspiracy. For example, Jackson points to the testimony of Daman Julian regarding a conversation with Patricia Peters in which she told him that she had just "picked up" a quarter or an eighth of a kilogram of cocaine. Trial Tr. at 373. Jackson objects on the ground that the prosecution failed to establish an adequate foundation to show that this statement was made in furtherance of the conspiracy. Taken in context, however, the statement formed a part of Julian's explanation of his joint efforts with Peters to sell crack cocaine in order to raise money to secure Jackson's release. For example, Jul-

ian testified that Peters acted at the direction of Jackson, even while he was in jail. Peters's statement was in furtherance of the conspiracy because it concerned the flow of drugs among co-conspirators at a time when Jackson was alleged to remain in control of the conspiracy.

■ Jackson further objects to the admission of Rhonda Morris's testimony as to three statements by Patricia Peters. Again, we find no abuse of discretion. The statements addressed the means by which the drugs were transported and Jackson's role in organizing the conspiracy. Similarly, the court was within its discretion in admitting two statements of Patricia Peters concerning efforts to avoid police detection of the conspiracy. Katherine Vazquez testified that Peters instructed her to implicate Moses Jackson if she were questioned by the police. Rhonda Morris attested to Peters's statement that she had lied to the grand jury in an effort to deflect responsibility for the conspiracy away from the defendant and toward Moses Jackson. We agree with the district court that the statements were admissible because they "were made pursuant to an attempt to keep the conspiracy going."

■ Jackson's objections to three statements of co-conspirators identifying the origins of their drugs are without merit. "Statements identifying ... a co-conspirator's source for cocaine have been deemed to be statements made 'in furtherance' of the conspiracy." *United States v. Meeks,* 857 F.2d 1201, 1203 (8th Cir.1988) (citing *United States v. Lewis,* 759 F.2d 1316, 1348 (8th Cir.), *cert. denied,* 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1983)).

### B. Constitutionality of Search Warrants.

Prior to trial, Jackson moved to suppress evidence seized pursuant to three search warrants. Jackson argues that the warrants were not supported by probable cause, or, in the alternative, that the officers executing the warrants did not act in good faith. The district court adopted the report of the magistrate recommending that the suppression motion be denied.

■ The applicable test for probable cause was set forth in *Illinois v. Gates,* 462

U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "The duty of the officer issuing a search warrant is to make a 'practical, common-sense decision' whether a reasonable person would have reason to suspect that evidence would be discovered, based on the totality of the circumstances." *United States v. Peterson*, 867 F.2d 1110, 1113 (8th Cir. 1989) (citing *Gates*, 462 U.S. at 238–39, 103 S.Ct. at 2332–33; *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983)). Our task on appeal is to ascertain whether the issuing officer had a "substantial basis" for concluding that probable cause existed. *Gates*, 462 U.S. at 238–39, 103 S.Ct. at 2332–33. Even where probable cause is found lacking, however, suppression will not be required if two conditions are met: (1) the executing officers relied in good faith on a search warrant signed by a neutral and detached magistrate, and (2) the officers' reliance on the warrant was objectively reasonable. *United States v. Leon*, 468 U.S. 897, 922–23, 104 S.Ct. 3405, 3420–21, 82 L.Ed.2d 677 (1984). The requirements of good faith and objectively reasonable reliance together constitute the "good faith" exception to the warrant requirement.

■ The record demonstrates that the warrant for 205½ Second Avenue South, executed on February 12, 1993, was supported by probable cause. Jackson objects that the warrant application relied on information provided by an informant who was an admitted crack addict. The affidavit of Corporal Randy Meier of the Clinton Police Department stated that a cooperating individual, Archie Kissee, brought Corporal Meier to 205½ Second Avenue South on February 10, 1995, and identified the apartment in which he had purchased crack cocaine on two occasions earlier that day. According to Corporal Meier, Kissee's information was corroborated by a confidential informant who had proven reliable in the past and who was not

known ever to have given false information. The magistrate judge below concluded that the information in the affidavit was "fresh and specific" and that Corporal Meier was forthright about the nature and extent of Kissee's drug addiction. We agree with the magistrate's observation that "although the typical crack addict cannot be trusted to perceive the truth about many things, one reliable piece of information possessed by [him or her] is the source of more crack."

■ The second search warrant challenged by Jackson, executed at Fontane's on August 5, 1993, was a form of "indicia" warrant. The warrant application was supported by the affidavit of Officer Ron Heeren. Officer Heeren recounted that on August 5, 1993, Amos Ellis reported to the police that he had been kidnapped and taken by force to Fontane's. Ellis stated that he had been assaulted and threatened with a handgun, and that the reason for the kidnapping was his refusal to pay money to a gang known as the Disciples. Ellis claimed that he had been taken to Fontane's to meet the "governor" of the Disciples. Ellis's statement to the police was attached to Officer Heeren's affidavit as Exhibit A. Officer Heeren went on to state that Wallace Jackson rented Fontane's and that he had seen Jackson wearing a six-point star. Based on experience and training provided by the Midwest Gang Investigators Association, Officer Heeren stated his belief that the six-point star was a symbol of the Disciples. Officer Heeren also reported that he had seen Lorenzo Dodd standing next to the rear entrance to Fontane's on several occasions, that Dodd had admitted his affiliation with the Disciples, and that Dodd's tattoos were known to be gang symbols. The warrant issued by Judge Van Zee of Iowa's Seventh Judicial District authorized officers to search for evidence of street gang membership or affiliation with any street gang.[1] At Fontane's,

---

1. Specifically, the warrant authorized officers to search for the following indicia of membership in the Black Gangster Disciples:

Any evidence of street gang membership of [sic] affiliation with any street gang, including, but not limited to, any drawing or miscellaneous writings regarding or evidencing gang membership; or objects or graffiti depicting gang members [sic] names, initials, logos,

monikers, slogans, or containing mention of street gang membership, affiliation, activity, or identity; any paintings, drawings, photographs, or photograph albums depicting persons, vehicles, weapons or locations which may appear upon observation to be relevant on the questions of gang membership or association, or which may depict items sought and/or believed to be evidence of any criminal activity; and newspaper clippings tending to relate

police seized a sawed-off shotgun found behind the building; a loaded, high-powered hunting rifle with a scope found on the roof; and several loaded handguns found in plain view inside the building. In addition, police seized numerous items believed to be gang paraphernalia.

■ The magistrate judge held, and the government tacitly concedes, that the warrant violated the Fourth Amendment because it failed to describe the items to be seized with requisite particularity. Instead, the government relies on the good faith exception held applicable to indicia warrants in *United States v. Haley*, 758 F.2d 1294 (8th Cir.1985). Turning to the two prongs of the *Leon* test, we defer to a finding of good faith unless clearly erroneous, but subject conclusions about the objective reasonableness of the officers' reliance to de novo review. Our review of the record convinces us that the warrant was neither " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' " *Leon*, 468 U.S. at 923, 104 S.Ct. at 3421 (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975)), nor "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Id.* For example, the warrant specified that the search was motivated by an alleged kidnapping by the Disciples. The place to be searched was Fontane's, where Ellis's kidnappers had allegedly taken him. The warrant also specified that Wallace Jackson would be found on the premises with particular items of gang paraphernalia. Because we find that the officers' reliance on the warrant was not objectively unreasonable, Jackson's argument for suppression must fail.

■ The third warrant challenged by Jackson was executed at 204½ South Second Street on August 10, 1993. The application for the warrant was supported by the affidavit of Officer Pat Cullen. According to Officer Cullen, an informant with a track record of reliability had observed a large amount of cocaine in the apartment. The informant had reported a conversation with a resident of the apartment to the effect that the cocaine was being readied for resale. Officer Cullen also maintained before the state district court judge that Wallace Jackson, then in jail, was the tenant of the apartment; that Jackson was a known drug dealer; that several known drug dealers had been observed coming to, staying briefly at, and then leaving the apartment; and that three other officers would corroborate his observations. We conclude probable cause existed for the issuance of the warrant.

## C. *Evidence of Firearms Seized at Fontane's.*

■ Jackson asserts that the district court erred in admitting evidence of firearms seized from Fontane's, the business managed by Jackson, on August 5, 1993. He argues that the firearms were irrelevant to the question of his guilt or innocence of conspiracy to distribute crack cocaine, and that their prejudicial effect outweighed their probative value pursuant to Federal Rule of Evidence 403. We review a district court's evidentiary rulings under the abuse of discretion standard. The record reveals that the prosecution presented evidence affirmatively linking Jackson's drug conspiracy to Fontane's. The prosecution also presented expert testimony from cooperating witness Moses Jackson and an agent of the Drug Enforcement Agency that drug traffickers commonly use firearms for protection. The firearms seized at Fontane's bore relevance to the question of whether Jackson was an armed co-conspirator in a drug distribution network, or, as he claimed, an innocent businessman uninvolved with the drug trade. We find no abuse of discretion in the district court's determination that the prejudicial effect of the firearms evidence did not outweigh its probative value.

## D. *Admissibility of Audiotape Recording.*

■ Jackson objects to the district court's refusal to admit in evidence an audiotape recording of a conversation between Wallace Jackson and Moses Jackson. After reviewing the tape outside the presence of the jury, the district court ruled that the tape was so inaudible that it lacked probative

---

details or reference to any crime; and any address books, lists of, or single references to, addresses or telephone numbers of persons

who may later be determined to belong to or be associated with any street gang.

value. In *United States v. Young*, 488 F.2d 1211, 1214 (8th Cir.1973), the court set forth the basis on which poor quality tapes will be held inadmissible: "Should the garbled portions be so substantial, in view of the purpose for which the tapes were offered, as to render the recording as a whole untrustworthy, admissibility will be denied." Here, the district court termed the tape "inaudible," "confusing," and "of no probative value." We find no error in its characterizations and no abuse of discretion in its refusal to admit the tape.

### E. Subpoena of State Prosecutor.

During the trial, Jackson attempted to subpoena Assistant County Attorney Bruce Ingham of Clinton County, Iowa, to testify regarding his office's decision to dismiss the state charges of possession of a firearm as a felon and gang-related activity filed against Jackson following the August 5, 1993, search of Fontane's. The prosecution filed a motion to dismiss after the federal grand jury handed down its indictment of Jackson. Apparently Jackson sought to show that the prosecutor "knew that his charges wouldn't stick, and ... that he didn't have the evidence." The district court granted the government's motion to quash the subpoena.

■■■ Ingham's testimony would have been irrelevant to Jackson's factual guilt or innocence of the crime for which he was on trial in federal court. Moreover, we can divine no link between a legitimate exercise of prosecutorial discretion and the credibility of any of the prosecution's witnesses. Accordingly, we find no abuse of discretion in the district court's granting of the government's motion to quash.

### F. Multiple Conspiracy Instruction.

■■■ Jackson contends that the district court should have granted an instruction directing the jury that if the evidence at trial proved the existence of multiple conspiracies rather than the single conspiracy charged in the indictment, the jury should return a verdict of not guilty. We agree with the Ninth Circuit that an issue of whether the defense produced sufficient evidence to sustain a particular instruction, such as a multiple conspiracy instruction, is generally a question of law subject to de novo review. *See United States v. Anguiano*, 873 F.2d 1314, 1317 (9th Cir.1989). "A multiple conspiracy instruction should be given only if there is evidence to support a finding of multiple conspiracies." *United States v. Lucht*, 18 F.3d 541, 552 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 363, 130 L.Ed.2d 316 (1994); *see Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit,* § 5.06G, Notes on Use (1992). Neither side introduced evidence indicating multiple conspiracies in this case. We find no reversible error in the district court's refusal to give the jury the defendant's requested instruction.

### G. Sentencing As Career Offender.

The defendant's argument that he should not be sentenced as a career offender under U.S.S.G. § 4B1.1 is now foreclosed by the Eighth Circuit's en banc decision in *United States v. Mendoza–Figueroa*, 65 F.3d 691 (8th Cir.1995). That decision holds that the Sentencing Commission did not exceed its statutory mandate by providing that persons convicted of drug conspiracies can be sentenced as career offenders. Accordingly, we find proper the application of section 4B1.1 to Jackson.

### H. Constitutionality of Crack/Powder Cocaine Sentencing Disparity.

As have many other defendants in this circuit, Jackson challenges the constitutionality of the Sentencing Guidelines' vast disparity in its penalties for the crack and powder forms of cocaine. Jackson raises a substantive due process claim of arbitrariness and irrationality, as well as an equal protection claim of disparate racial impact. We are not at liberty to contradict the decision of another panel of this court, and Jackson's claims have previously been rejected in *United States v. Buckner*, 894 F.2d 975, 978–80 (8th Cir.1990), and *United States v. Clary*, 34 F.3d 709, 714 (8th Cir.1994), respectively.[2]

---

**2.** This author has previously argued that the crack/powder disparity is unconstitutional, *see United States v. Willis*, 967 F.2d 1220, 1226–27 (8th Cir.1992) (Heaney, J., concurring), *United States v. Johnson*, 977 F.2d 1297, 1300 (8th Cir. 1992), but recognizes that the cases have been decided otherwise. In February 1995, the Sentencing Commission "strongly recommend[ed] against a 100–to–1 quantity ratio." U.S. Sen-

*I. Drug Quantities.*

█ Under the Sentencing Guidelines, the government generally bears the burden of proving drug quantities by a preponderance of the evidence. *United States v. Simmons,* 964 F.2d 763, 771 (8th Cir.1992); *but see United States v. Matthews,* 29 F.3d 462, 463 (8th Cir.1994) (citing with approval the district court's application of the clear and convincing standard where the relevant conduct would result in a "many-fold" increase in the sentence). The district court held Jackson accountable for at least 150, but less than 500, grams of crack cocaine.

█ The district court credited the testimony of Moses Jackson, Daman Julian, and Katherine Vazquez that Wallace Jackson made at least five trips to Cedar Rapids with at least one ounce of crack cocaine per trip, concluding that Wallace Jackson should be held accountable for five ounces of crack cocaine distributed in Cedar Rapids. In addition, the district court found that Wallace Jackson's taped reference to the delivery of "three O's," taken together with the testimony of Special Agent LaMere, Moses Jackson, Daman Julian, and others regarding the meaning of "O" and the form of the drugs distributed by Jackson, warranted the attribution of three additional ounces of crack cocaine. The district court found that the government had made a clear and convincing showing of Jackson's responsibility for at least eight ounces of crack cocaine, equivalent to 226.8 grams, placing Jackson squarely within the range of base offense level 34 pursuant to U.S.S.G. § 2D1.1.

Our review of the record convinces us that the district court's attribution of eight ounces of crack cocaine to Jackson was supported by the evidence. Accordingly, we affirm the sentencing of Jackson at base offense level 34.

*J. Adjustment for Possession of a Firearm.*

█ Jackson was given a two-level increase pursuant to U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon in connec-

tion with his drug trafficking. The commentary to that guideline provides that the adjustment should be applied to a drug trafficker found in possession of a dangerous weapon "unless it was clearly improbable that the weapon was connected with the offense." *Id.,* comment., n. 3. We review the district court's factual finding on firearm possession for clear error.

█ The district court founded its finding primarily on the weapons seized from Fontane's on August 5, 1993. The court found that:

> the evidence is overwhelming that the defendant had set up an arrangement at Fontane's where people were on the roof with high-powered rifles as lookouts and that they were in a position to protect themselves with a multitude of firearms and that the defendant was directly responsible for making those arrangements as the manager, organizer and leader of this conspiracy, and certainly would be responsible for those firearms.

The district court also pointed to the testimony of Daman Julian and Moses Jackson that the defendant had supplied firearms to them. We conclude that the record supports the district court's findings and that it was not "clearly improbable" that the weapons found at Fontane's were related to the drug trafficking conspiracy.

*K. Adjustment for Role in the Offense.*

█ The district court applied a four-level increase pursuant to U.S.S.G. § 3B1.1 for Jackson's role as an organizer or leader of criminal activity that involved five or more participants. We review the district court's factual findings on Jackson's role for clear error. *United States v. Ballew,* 40 F.3d 936, 943 (8th Cir.1994).

Seven co-conspirators took the stand and admitted to being members of a criminal conspiracy with Jackson, including Moses Jackson, Daman Julian, Katherine Vazquez,

tencing Commission, *Special Report to the Congress: Cocaine and Federal Sentencing Policy* 198–200 (1995). The Commission suggested that the quantity ratio be replaced with a new model emphasizing a variety of specific enhancements to penalize the distribution of drugs to juveniles

and pregnant women, the use of firearms or other dangerous weapons, the recruitment of youth into the distribution of crack, and the commission of violent acts. Congress appears to have rejected the Commission's recommendation for the time being.

Jack Evans, Carrie Brown, Rhonda Morris, and Christy Meyerman. Accordingly, Jackson confines his objection to the issue of whether he was the organizer or leader of the conspiracy. Without exception, each of the co-conspirator witnesses testified that Wallace Jackson was the leader of the conspiracy, responsible for the recruitment of new members; for the distribution, transportation, conversion, repackaging, and resale of the drugs; and for securing, maintaining, and fortifying the various apartments. The record fully supports the district court's conclusion that "the evidence is overwhelming that the defendant was a leader and an organizer of a criminal conspiracy that involved five or more people ..." Accordingly, we affirm the four-level adjustment for Jackson's role in the offense.

*L. Adjustment for Obstruction of Justice.*

Pursuant to U.S.S.G. § 3C1.1, Jackson was given a two-level increase for obstructing justice by committing perjury. The district court concluded that Jackson testified falsely on a material matter when he stated that the phrase "three O's" referred to three outfits, not three ounces of drugs. The record supports the district court's findings, and we hold the two-level adjustment to be warranted.

## II. Vaniel Graham

Vaniel Graham's involvement in this case stems from an incident on December 17, 1993. Graham had been informed that Moses Jackson was a "snitch" who had been cooperating with law enforcement officials in their investigation of drug trafficking operations in Clinton, Iowa. At that time, pursuant to a plea agreement with the United States Attorney's Office, Moses Jackson was, in fact, a cooperating witness in the case of *United States v. Wallace Andre Jackson, et al.* In statements to law enforcement agents and in testimony before a federal grand jury, Moses Jackson had implicated numerous individuals, including Graham, in drug trafficking activities. Graham learned about Moses Jackson's cooperation from Patricia Peters, who had obtained from Wallace Andre Jackson a copy of summaries of Moses Jackson's testimony before the grand jury. The summaries had been prepared by Wallace Jack-

son's attorney, Wallace Taylor, from notes taken during the testimony. Taylor provided a typed copy of them to his client, who was the main target of the investigation and who was then incarcerated at the Linn County Jail. Wallace Jackson in turn mailed them to Patricia Peters.

After learning about his testimony, Graham confronted Moses Jackson at the residence of his cousin, Eleanor Jackson, and accused him of "snitching." While an unidentified third man pinned Moses Jackson to the bed, Graham placed a gun to his head and demanded to know if he had been cooperating with law enforcement. Graham stated that he had seen the papers obtained by Patricia Peters. Moses Jackson denied that he had assisted law enforcement officials in any way. At that point, Graham summoned Patricia Peters, who arrived bearing the summaries prepared by attorney Taylor. After a brief interrogation about the testimony attributed to Jackson in the summaries, Graham and Peters released him unharmed.

On December 22, 1993, Jackson notified Special Agent Rick LaMere of the Drug Enforcement Agency that he had been threatened at gunpoint by Graham. On January 11, 1994, agents executed a search warrant at Eleanor Jackson's residence, finding a 9 millimeter Hi–Point Model C pistol located over a ceiling tile. Graham admitted that the gun was his. A second search warrant was executed at Patricia Peters's residence, where agents found copies of attorney Taylor's summaries.

Graham was arrested and charged with one count of witness intimidation, in violation of 18 U.S.C. § 1512(b)(1) and (b)(3), and one count of using or carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Graham subsequently pleaded guilty to both offenses and was sentenced by the district court to a term of imprisonment of 112 months.

On appeal, Graham challenges the district court's application of U.S.S.G. § 2J1.2(b)(2), which provides for a three-level increase "[i]f the offense resulted in substantial interference with the administration of justice." Although stating that "the facts of [Graham's] case aren't as strong as some of the cases"

and noting that Moses Jackson had not, in fact, been dissuaded from continuing his cooperation, the district court applied the increase on the grounds that Graham's actions "resulted in the expenditure of substantial governmental resources." The district court emphasized that the government made significant efforts to track down the means by which the grand jury materials had been leaked and disseminated.

 Indeed, the application notes to § 2J1.2(b)(2) define "substantial interference with the administration of justice" to include "the unnecessary expenditure of substantial governmental or court resources." We are instructed by the Supreme Court that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States,* ── U.S. ──, ──, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993). Seeing no such violation or conflict, we accord the application note authoritative weight.

 Nevertheless, we hold that the district court erred in applying § 2J1.2(b)(2) to Graham. The application of a sentencing guideline is a question of law, which we review *de novo.* The basis for the district court's ruling was the unnecessary expense incurred by the government in investigating the source of the leaked grand jury testimony. As the district court saw it, Graham's actions "very legitimately resulted in the Government expending substantial resources in tracking down these reports, how far they had been disseminated, who had them, what did they have, who else might be the subject of threats or intimidation."

The flaw in the court's reasoning is the lack of a causal link between Graham's crimes and and the government's need to investigate the leak. The problem is one of nexus. The government's decision to commit substantial resources to its investigation was entirely proper under the circumstances; but the person whose deeds created the need for the investigation was not Graham. In light of the fact that the very targets of the prose-

cution had been made privy to an unknown quantity of grand jury testimony, the urgent necessity of investigating the leak would have existed even without Graham's attempted intimidation of Moses Jackson.

Graham neither procured nor disseminated the leaked summaries. Although Graham's crimes were certainly triggered by the contents of the summaries, he bears no responsibility for their initial release. Had Graham succeeded in forcibly halting Moses Jackson's cooperation with law enforcement, then he might well have qualified for the § 2J1.2(b)(2) increase. That is not, however, the case before us.

 We believe the source of the leak, not Graham, bears the responsibility for the government's substantial investigative expenditures.[3] The fact that the government learned of the leak as a consequence of Graham's actions does not make Graham the source of the leak. To hold otherwise would be equivalent to penalizing the messenger for the message that he, however unintentionally, conveys. Accordingly, we reverse the district court's imposition of a three-level increase under § 2J1.2(b)(2).

### III. Conclusion

As to Wallace Andre Jackson, we affirm both his conviction and his sentence. We remand Vaniel Graham's case for resentencing consistent with this opinion.

3. Of course, we express no opinion as to the legal or ethical propriety of the actions of attorney

Taylor or any other individual involved in the dissemination of the summaries.