# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1969

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Michael Fiorito, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 15, 2011
Filed: May 23, 2011

_____

Before WOLLMAN, MURPHY, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

After a federal jury found Michael Fiorito guilty of six counts of mail fraud and one count of conspiracy to commit mail fraud, the district court[1] sentenced him to a total of 270 months' imprisonment. Fiorito appeals, raising multiple challenges to his conviction and sentence. For the following reasons, we affirm.

_____

[1] The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

## I.    BACKGROUND

In 2006, Detective Eric Kleinberg of the Minnesota Financial Crimes Task Force began investigating Michael Fiorito, a mortgage broker, in connection with an equity-stripping scheme that allegedly had defrauded Constance Dang of $36,000 of her home's equity. Detective Kleinberg interviewed Dang, viewed records from the local police department, and obtained financial and real estate documents both from the title company involved in the sale of Dang's home and from Fiorito's bank. As he pursued his investigation, Detective Kleinberg learned that Fiorito was under scrutiny by other state and private investigators for similar schemes involving several other victims. After several months of investigation, Detective Kleinberg obtained a warrant to search Fiorito's residence for incriminating documents.

Ultimately, a federal grand jury returned an indictment charging Fiorito and his assistant, Kristin Jerde, with conspiracy and mail fraud. Jerde pled guilty and agreed to cooperate against Fiorito. A grand jury returned a superseding indictment that charged Fiorito with one count of conspiracy to commit mail fraud, a violation of 18 U.S.C. § 371, and six counts of mail fraud, violations of 18 U.S.C. § 1341. The indictment alleged that Fiorito had defrauded seventeen homeowners of more than $400,000.

Fiorito moved to suppress the fruits of Detective Kleinberg's search of his residence, arguing that the warrant was not supported by probable cause and lacked particularity. After a suppression hearing, a magistrate judge[2] recommended that the motion to suppress be denied. Following *de novo* review, the district court adopted the magistrate judge's report and recommendation and denied Fiorito's motion to suppress. The case proceeded to trial.

_____

[2] The Honorable Janie S. Mayeron, United States Magistrate Judge for the District of Minnesota.

With some variation between victims, Fiorito's basic scheme was to convince financially desperate homeowners to refinance or sell their homes to him and then clandestinely intercept their proceeds checks—representing the equity realized in the sale or refinance—and deposit them into his bank account. According to Jerde's testimony, "[w]e would find vulnerable homeowners who were in foreclosure, and Mr. Fiorito or someone else would purchase their home and take their equity check, steal it and put it in his bank account." For example, Dang testified that Fiorito had offered to "refinance [my] home, [and] get me a considerable amount of money." According to Dang's testimony, Fiorito convinced her to refinance her home, but instead he had her sign papers at closing that surreptitiously effected a sale of the house to Fiorito. After closing, Fiorito told her that she would be getting a FedEx package but that she should not open it. Fiorito intercepted the package, which contained Dang's $36,000 seller's proceeds check, and convinced her to endorse the check to him. In return, he wrote her a check for $2,200, which he represented to be her profit from the transaction. The Government called ten other homeowners who testified that Fiorito had victimized them through similar schemes.

After the trial concluded, the jury returned a verdict of guilty on all seven counts. The district court denied Fiorito's motion for a judgment of acquittal. After a two-day sentencing hearing, the court assigned Fiorito a total offense level of 31, a criminal history category of VI, and an advisory sentencing guidelines range of 188-235 months' imprisonment. The total offense level was obtained by grouping all seven counts and adding 24 levels in enhancements to a base offense level of seven. These enhancements included a two-level increase for vulnerable victims, *see* U.S.S.G. § 3A1.1(b), a two-level increase for sophisticated means, *see* § 2B1.1(b)(9)(C), and a two-level increase for abuse of a position of trust, *see* § 3B1.3. Based on the factors in 18 U.S.C. § 3553(a), the court granted the Government's motion for an upward variance and sentenced Fiorito to 270 months' imprisonment. Fiorito now appeals, challenging both his conviction and sentence.

## II.    DISCUSSION

Fiorito raises five points on appeal.  First, Fiorito challenges the district court's denial of his motion to suppress.  Second, Fiorito challenges the district court's denial of his motion for a judgment of acquittal on counts three, four, five, and six.  Third, Fiorito argues that the district court erred in refusing to give the jury an instruction regarding the requisite mental state for conspiracy to commit mail fraud.  Fourth, Fiorito contends that the evidence presented by the Government at trial prejudicially varied from the scheme alleged in the indictment.  Fifth, Fiorito challenges his sentence, asserting that the district court committed procedural error and imposed a sentence that is substantively unreasonable.[3]

### A.    Motion to Suppress

Fiorito challenges the denial of his motion to suppress, arguing first that the district court erred in applying the *Leon* good faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897 (1984).  On appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo*.  *See United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008).  "[W]e defer to a finding of good faith unless clearly erroneous, but subject conclusions about the objective reasonableness of the officers' reliance to de novo review."  *United States v. Jackson*, 67 F.3d 1359, 1366 (8th Cir. 1995).

In pursuit of a warrant to search Fiorito's residence, Detective Kleinberg submitted an affidavit that alleged facts related to only one victim, Constance Dang.

---

[3] Fiorito submitted a *pro se* supplemental brief raising additional challenges to the sufficiency of the evidence and the calculation of his advisory sentencing guidelines range.  Because Fiorito is represented by counsel, we decline to consider these additional arguments. *See United States v. Moore*, 481 F.3d 1113, 1114 n.2 (8th Cir. 2007).

However, Detective Kleinberg requested and obtained a warrant authorizing him to conduct a broad search of Fiorito's residence for incriminating documents beyond those pertaining to Dang. At the suppression hearing, Fiorito argued that this warrant was unsupported by probable cause. The district court held that the affidavit provided probable cause to search for documents related to Dang but that the warrant lacked probable cause to the extent that it authorized a search for documents unrelated to Dang. The court concluded, however, that suppression was not warranted due to the *Leon* good-faith exception. We assume without deciding that the district court was correct to find insufficient probable cause because we agree that the *Leon* good-faith exception applies.

The Fourth Amendment commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The ordinary sanction for police violation of Fourth Amendment limitations has long been suppression of the evidentiary fruits of the transgression. *See Weeks v. United States*, 232 U.S. 383 (1914); *see also Mapp v. Ohio*, 367 U.S. 643 (1961). However, this exclusionary rule is not applied in cases "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Leon*, 468 U.S. at 920. In cases of good faith, the evidence, although seized pursuant to a warrant that lacked probable cause, nonetheless is admissible at trial. *Leon* identified four circumstances in which an officer's reliance on a warrant is not in objective good faith:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

-5-

*Perry*, 531 F.3d at 665 (quoting *United States v. Proell*, 485 F.3d 427, 431 (8th Cir. 2007)). Fiorito argues on appeal that the third circumstance is present here because Detective Kleinberg's affidavit was "so lacking in indicia of probable cause" as to render "entirely unreasonable" a belief in the existence of probable cause to search for documents beyond those related to Dang. In determining whether Detective Kleinberg "harbored an objectively reasonable belief in the existence of probable cause" to search for documents unrelated to Dang, *see Leon*, 468 U.S. at 926, "we must look to the totality of the circumstances, including any information known to the officer[] but not presented to the issuing judge," *Perry*, 531 F.3d at 665 (quoting *Proell*, 485 F.3d at 431).

At the suppression hearing, Detective Kleinberg testified that although his investigation had focused on the Dang transaction, he had been informed about other investigations involving other victims. For example, Detective Bill Lannon of the Duluth Police Department related information to Detective Kleinberg about another victim, Cynthia Jerris, whom Fiorito had defrauded through an equity-stripping scheme similar to the one involving Dang. Shelly Gonzalez, an employee of a title company that handled some of Fiorito's closings, informed Detective Kleinberg that Fiorito had come under suspicion for two real estate closings in addition to the closing involving Dang. And Julia Palumbo from the Minnesota Attorney General's Office related that Fiorito was under investigation by her office as "an active, fairly aggressive equity-stripping suspect who had victimized several individuals . . . [including] Dang."

Fiorito argues that Detective Kleinberg's failure to include this information in his affidavit shows that Detective Kleinberg knew that the information was unreliable, precluding us from considering that information in the good-faith analysis. Detective Kleinberg testified that he did not include any of this information in his affidavit because Dang was the only victim he had investigated personally and he felt that "I would only be guessing until after I had sat down and conducted complete

-6-

investigations on those [other] individuals." However, there is no requirement that an affiant have first-hand knowledge of every allegation he includes in his affidavit. *See, e.g.*, *United States v. Jones*, 471 F.3d 868, 874 (8th Cir. 2006) (affirming the validity of a warrant even though "a detective other than the affiant [was] the source of the information in the affidavit"). Detective Kleinberg's mistaken belief to the contrary does not prevent us from considering the information related to him by other investigators when conducting the *Leon* inquiry, which "'is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring v. United States*, 555 U.S. ---, 129 S. Ct. 695, 703 (2009) (quoting *Leon*, 468 U.S. at 922 n.23). Like the district court, we conclude that Detective Kleinberg's knowledge of information regarding victims beyond Dang provided sufficient indicia of probable cause to make his search for documents related to other victims objectively reasonable. *See United States v. Warford*, 439 F.3d 836, 841-42 (8th Cir. 2006).

Next, Fiorito argues that because the search warrant authorized a search for "[e]ntire files involving [Fiorito]," it violated the Fourth Amendment's mandate that "no Warrants shall issue . . . [unless] particularly describing the place to be searched, and the persons or things to be seized," U.S. Const. amend. IV. Whether a warrant satisfies the Fourth Amendment's particularity requirement is a question of law that we review *de novo*. *See United States v. Brobst*, 558 F.3d 982, 991 (9th Cir. 2009); *United States v. Brooks*, 427 F.3d 1246, 1251 (10th Cir. 2005).

"The particularity requirement 'is a standard of practical accuracy rather than a hypertechnical one.'" *United States v. Thurman*, 625 F.3d 1053, 1057 (8th Cir. 2010) (quoting *United States v. Peters*, 92 F.3d 768, 769-70 (8th Cir. 1996)), *cert. denied*, 563 U.S. ---, 79 U.S.L.W. 3553 (2011). "[W]hether a warrant fails the particularity requirement cannot be decided in a vacuum. The court will base its determination on such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the

case." *Milliman v. Minnesota*, 774 F.2d 247, 250 (8th Cir. 1985) (internal citation omitted); *see also Andresen v. Maryland*, 427 U.S. 463, 480 n.10 (1976). Taking these factors into consideration, we conclude that the warrant in the instant case satisfied the Fourth Amendment's particularity requirement.

Fiorito focuses on the language in the warrant that authorized a search for "[e]ntire files involving [Fiorito]." However, this broad phrase was located at the opening of an extensive list of specific documents sought. The challenged paragraph of the warrant authorized a search for:

> Entire files involving [Fiorito], including but not limited to copies of all deeds, mortgages, promissory notes, contracts for deed; purchase agreements; appraisals; checks received, disbursed, or cut as part of the closing; the disbursement ledger; closing instructions; any HUD-1 settlement statements; photo I.D.s; typed or handwritten notes; and any other document for any other residential real property transaction involving [Fiorito].

The broad phrase at the opening must be read in the context of the specific list that follows. *See Andresen*, 427 U.S. at 480. To be sure, even if the broad language is read in light of these specific examples, the scope of the warrant is expansive. However, an additional consideration weighs in favor of the warrant's constitutionality. The warrant did not authorize a blanket search of documents for no particular purpose, but rather for the purpose of discovering evidence of an ongoing, well-defined equity-stripping scheme. The broad language of the warrant must be given a practical, rather than a hypertechnical, interpretation that is cabined by the purpose for which it issued. *See Milliman*, 774 F.2d at 250. Indeed, Detective Kleinberg testified that he understood the warrant to be limited to documents "related to equity stripping and financial manipulation." Considered in light of the illustrative

list of items to be seized and the overarching purpose of the search, we conclude that the warrant was sufficiently particularized.[4]

### B. Motion for a Judgment of Acquittal

Fiorito challenges the district court's denial of his motion for a judgment of acquittal, maintaining that the particular mailings that are the subject of counts three, four, five, and six were not in furtherance of the alleged scheme to defraud. "We employ a strict standard of review regarding denials of motions for acquittal, viewing the evidence in the light most favorable to the guilty verdict, resolving all evidentiary conflicts in favor of the government, and accepting all reasonable inferences supported by the evidence." *United States v. Samuels*, 611 F.3d 914, 917 (8th Cir. 2010) (quoting *United States v. Donnell*, 596 F.3d 913, 924 (8th Cir. 2010)), *cert. denied*, 562 U.S. ---, 79 U.S.L.W. 3493 (2011).

Title 18 U.S.C. § 1341 subjects to criminal penalty anyone who, "having devised or intending to devise any scheme or artifice to defraud, . . . for the purpose of executing such scheme or artifice or attempting so to do, . . . knowingly causes to be delivered by mail or [interstate] carrier" any matter or thing. The mail fraud statute "does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud." *Schmuck v. United States*, 489 U.S. 705, 710 (1989) (quoting *Kann v. United States*, 323 U.S. 88, 95 (1944)). A mailing relied upon as a predicate for a mail fraud charge must be made "in furtherance of some essential step in the scheme," *United States v. French*, 88 F.3d 686, 688 (8th Cir. 1996), or "for the purpose of executing[] the scheme," *Kann*, 323 U.S. at 93. However, "to be part of the execution of the fraud, . . . the use of the mails

---

[4] Accordingly, we also reject Fiorito's suggestion that the warrant's lack of particularity made it "facially deficient," preventing any officer from relying on it in good faith. *See Leon*, 468 U.S. at 923.

need not be an essential element of the scheme." *Schmuck*, 489 U.S. at 710. It is sufficient if the mailing is "incident to an essential part of the scheme," *Pereira v. United States*, 347 U.S. 1, 8 (1954), or "a step in [the] plot," *Badders v. United States*, 240 U.S. 391, 394 (1916).

Fiorito first challenges the mailing that served as a predicate for count three, a HUD-1 form related to Fiorito's transaction with Darryl and Lorri Lastimosa. A HUD-1 settlement statement is a financial form, generated by the title company handling the sale or refinance of a home, which summarizes the nature and details of the transaction. The HUD-1 related to count three describes the 2005 sale by the Lastimosas of their home to Fiorito for $113,000. However, Darryl Lastimosa testified at trial that he and his wife did not understand the papers they signed at closing and that Fiorito had led them to believe that they were refinancing, not selling, their home. Fiorito also had them sign a power of attorney form at closing, which allowed him to deposit their sellers' proceeds check into his own account. Because the Lastimosa transaction funded "at the table," meaning that the sellers' proceeds were disbursed to Fiorito's account before the HUD-1 was mailed, Fiorito argues that the mailing of the HUD-1 could not have furthered his scheme to defraud the Lastimosas. We are unpersuaded. Fiorito was engaged in an ongoing fraudulent scheme—a scheme that ultimately defrauded at least eleven victims over the course of three years. The owner of the title company that handled the Lastimosa transaction testified that without the mailing of the HUD-1, the mortgage lender likely would have unwound the loan and the transaction would have come under scrutiny. Because the mailing of the HUD-1 was essential for Fiorito to keep his ongoing scheme from coming under scrutiny, we conclude that it was in furtherance of the fraud. *See United States v. McKanry*, 628 F.3d 1010, 1017 (8th Cir.), *cert. denied*, 563 U.S. ---, 79 U.S.L.W. 3568 (2011); *see also Schmuck*, 489 U.S. at 711-12.

Next, Fiorito challenges the mailings that served as the predicates to counts four and five. Count five also involves the Lastimosas. After surreptitiously buying their

-10-

home, Fiorito began charging the Lastimosas rent for continuing to live there. However, he labeled the payment coupons as "mortgage" statements, so that the Lastimosas would continue to believe that they had refinanced, and not sold, their home. The mailing of these fraudulent mortgage coupons to the Lastimosas constitutes the mailing alleged in count five. Count four relies on false mortgage coupons arising out of a similar scheme perpetrated on a different victim, Lori Erickson. Fiorito contends that these false mortgage coupons were not in furtherance of his equity-stripping scheme because the scheme came to completion once the seller's proceeds checks were intercepted. However, mailings which occur after the receipt of goods obtained by a fraudulent scheme "are within the statute if they 'were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.'" *United States v. Lane*, 474 U.S. 438, 451-52 (1986) (quoting *United States v. Maze*, 414 U.S. 395, 403 (1974)). Both Darryl Lastimosa and Erickson testified that the "mortgage" coupons led them to believe that they still owned their homes. We hold that it was reasonable for the jury to conclude that the fraudulent mortgage statements furthered Fiorito's scheme by leading the victims to believe that they still owned their homes and thereby delaying detection of the fraud.

Finally, Fiorito argues that the mailing alleged in count six was not in furtherance of his fraud. In the scheme underlying this count, Fiorito defrauded Cynthia Jerris by having his wife buy Jerris's house for less than its market value without Jerris's knowledge, intercepting Jerris's $14,456 seller's proceeds check, and attempting to resell the house at full value. In addition to paying a below-market price for the home, the purchase was financed partially by a "silent" second mortgage of $8,500. The HUD-1 for this transaction indicates that Jerris herself financed $8,500 of the purchase and retained a mortgage in the home to secure this loan to Fiorito's wife. Since Fiorito never informed Jerris of this second mortgage or intended to repay

it, its effect was to reduce the purchase price of the home by $8,500.[5]  However, this meant that the home was encumbered by a second mortgage, which was discovered by the title company when Fiorito sought to sell the home in order to realize the remaining equity.  Fiorito first tried to convince Jerris to sign a mortgage satisfaction and then attempted to strong-arm the new buyer's lender into closing the transaction with the house still encumbered by the second mortgage.  After both of these attempts failed, Fiorito brought a quiet title action against Jerris, falsely claiming that the $8,500 loan had been paid in full.  In prosecuting this suit, Fiorito's attorney mailed certain discovery requests to Jerris, the mailing that is the subject of count six.

We conclude that the discovery requests were mailed in furtherance of the fraud.  While the fraud was partially successful when the sale of the house closed and Fiorito stole Jerris's seller's proceeds check, Fiorito sought to resell the house at full value to realize the remaining equity and complete the scheme.  Fiorito was unable to do so until eliminating the $8,500 mortgage, so it became necessary for Fiorito to bring the quiet title action before he could resell the home and realize the remaining equity.  It therefore was reasonable for the jury to conclude that the discovery requests were "incident to an essential part of the scheme."  *See Pereira*, 347 U.S. at 8.

## C.    Jury Instruction

Fiorito's third argument challenges the district court's refusal to instruct the jury that, to convict him on the conspiracy count, they would need to find that Fiorito's fraudulent scheme "contemplated" the use of the mails.  *See United States v. Donahue*, 539 F.2d 1131, 1135 (8th Cir. 1976).  The district court declined Fiorito's proffered instruction and instead gave an instruction that required the jury to find that the use of the mails was "reasonably foreseeable to the defendant."  We review the

---

[5] Fiorito utilized a similar silent second mortgage to fund $5,652 of the Lastimosa transaction.

-12-

district court's formulation of jury instructions for abuse of discretion. *See United States v. White Calf*, 634 F.3d 453, 456 (8th Cir. 2011). In this case, we need not decide whether the district court abused its discretion in refusing the proffered instruction, because any error in doing so was harmless.[6]

Even in the face of an erroneous jury instruction, "the error may be disregarded if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *United States v. Inman*, 558 F.3d 742, 749 (8th Cir. 2009) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). Fiorito had been a mortgage broker for four years and certainly was aware that a real estate transaction involved sending numerous documents by mail or commercial carrier, including HUD-1 forms, loan applications, and mortgage notes. Moreover, Fiorito knew that proceeds checks frequently would be sent by mail or commercial carrier. Indeed, Dang testified that Fiorito told her that she would be receiving a package through FedEx containing her proceeds check. Finally, the fraudulent "mortgage" coupons that are the subject of counts four and five were mailed either directly by Fiorito or by one of his employees. We conclude, beyond a reasonable doubt, that a rational jury would have found that Fiorito's fraudulent scheme contemplated the use of the mails.

## D. Variance

Fiorito next argues that the facts proven by the Government's evidence at trial varied prejudicially from the essential elements of the offense charged in the indictment. Specifically, Fiorito contends that the indictment charged a scheme to defraud vulnerable homeowners, while the evidence at trial tended to show that the

---

[6] In *United States v. Nelson*, we suggested that *Donahue* "may be inconsistent with *Pereira*, which holds that specific intent to use the mails is not necessary to prove mail fraud so long as use of the mails can be reasonably foreseen." 988 F.2d 798, 805 n.3 (8th Cir. 1993). In light of our conclusion that any instructional error was harmless, we need not address the continuing vitality of *Donahue*.

real victims of Fiorito's fraud were the mortgage lenders. We review variance challenges *de novo*. *United States v. Stuckey*, 220 F.3d 976, 979 (8th Cir. 2000). "[A] variance occurs when the essential elements of the offense set forth in the indictment are left unaltered but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Gavin*, 583 F.3d 542, 547 (8th Cir. 2009) (quoting *United States v. Begnaud*, 783 F.2d 144, 147 n.4 (8th Cir. 1986)).

We find no material difference between the indictment and the evidence introduced at trial. Fiorito points to the court's statement at the sentencing hearing that "in some cases really what Fiorito was doing was stealing from the lender using the homeowner sort of as a tool." However, the court indicated that it noticed this aspect of the case when it was reviewing post-trial arguments regarding loss calculation, and it expressly acknowledged that "this whole case was . . . presented [by the Government] as a case where Fiorito stole from homeowners." This latter characterization of the Government's case is supported by the record. The Government called eleven victimized homeowners, who testified extensively about their dealings with Fiorito. The Government did not call a single mortgage lender as a witness. The indictment charged that Fiorito's scheme was to defraud homeowners out of their equity, and this is precisely what the Government's evidence proved. We conclude that Fiorito's variance argument is without merit.

### E.    Sentence

Finally, Fiorito challenges the 270 month sentence imposed by the district court, alleging both procedural and substantive error. Following *Gall*, we first "ensure that the district court committed no significant procedural error," including "failing to calculate (or improperly calculating) the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). We review the district court's construction and application of the sentencing guidelines *de novo* and its factual findings for clear error. *United States v. Cordy*, 560 F.3d 808, 817 (8th Cir. 2009).

First, Fiorito challenges the district court's application of a two-level vulnerable victim enhancement. *See* § 3A1.1(b)(1). Application of this enhancement "requires a fact-based explanation of why advanced age or some other characteristic made one or more victims 'unusually vulnerable' to the offense conduct, and why the defendant knew or should have known of this unusual vulnerability." *United States v. Anderson*, 349 F.3d 568, 572 (8th Cir. 2003). Almost all of Fiorito's victims were in financial distress and faced the threat of losing their homes. Some of the victims were elderly, one was an alcoholic, and many were unsophisticated or vulnerable in other ways. For example, Cynthia Jerris testified that when Fiorito first contacted her she was suffering from bipolar-related "severe depression [and] mania," which had caused her to lose her job just months earlier. Jerris's mental condition certainly made her unusually vulnerable to Fiorito's fraud. Moreover, the district court did not clearly err in finding that Fiorito knew or should have known of the vulnerability of Jerris and his other victims. *See United States v. Replogle*, 628 F.3d 1026, 1030 (8th Cir. 2011) ("[W]hether a defendant knew or should have known of a victim's vulnerability [is a] factual determination[] that we review for clear error."). Jerde, Fiorito's assistant, testified that she and Fiorito "were looking for vulnerable, poor, dumb people so that they wouldn't be able to catch on to our scheme." Based on these facts, we conclude that the district court did not err in applying the vulnerable victim enhancement.

Next, Fiorito challenges the district court's application of an enhancement for use of sophisticated means. *See* § 2B1.1(b)(9)(C). The application notes suggest that the enhancement is targeted at "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." § 2B1.1 cmt. n.8(B). "Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme." *United States v. Bistrup*, 449 F.3d 873, 882 (8th Cir. 2006). We hold that the enhancement was properly applied. To be sure, the basic element of Fiorito's scheme—intercepting and stealing the victim's proceeds check—was relatively simple. However the scheme as a whole spanned three years and at least eleven victims and certainly involved "repetitive and

coordinated conduct." *See id.* In each case, Fiorito targeted a vulnerable homeowner and convinced him to sell or refinance his home. At closing, he coordinated the actions of the owner, title company, and mortgage lender to ensure that the deal went through without any party learning of the fraudulent nature of the transaction. Moreover, in some cases Fiorito used complex and sophisticated financial tools to increase the amount of money stolen, such as the silent second mortgage employed in the Lastimosa and Jerris transactions. The district court did not err in concluding that these facts supported an enhancement for use of sophisticated means.

Third, Fiorito challenges the application of a two-level enhancement for abuse of a position of trust. *See* § 3B1.3. The inquiry as to whether this enhancement should apply "is fact intensive because it turns on the precise relationship between the defendant and her victims and therefore cannot be decided on the basis of generalities such as 'lawyers and doctors occupy positions of trust but bank tellers and insurance agents do not.'" *United States v. Baker*, 200 F.3d 558, 564 (8th Cir. 2000). We previously have held that this enhancement may be applied to the relationship between a mortgage broker and a lender. *See United States v. Septon*, 557 F.3d 934, 938 (8th Cir. 2009). Other circuits have held that the enhancement may be applied to the relationship between an investment broker or financial planner and an investor. *See United States v. Hart*, 273 F.3d 363, 376-78 (3d Cir. 2001); *United States v. Reeves*, 255 F.3d 208, 212 (5th Cir. 2001); *United States v. Hirsch*, 239 F.3d 221, 227-28 (2d Cir. 2001). Another circuit has suggested strongly that it would apply the enhancement to the relationship at issue here, between a mortgage broker and a borrower. *See United States v. Fuchs*, 635 F.3d 929, 933 (7th Cir. 2011).

In light of the precise relationship between Fiorito and his victims in this case, we conclude that the enhancement was properly applied. Fiorito's relationship with his victims was not an "arms length" one; rather, he met directly with his victims and personally persuaded them to sell or refinance their homes. As the district court found, Fiorito went to great lengths to place himself in a position of trust with respect

to his victims and even had many of them sign forms granting him power of attorney, which he then used to endorse and deposit their proceeds checks into his own account. Many of the victims were unsophisticated, and most of them were led by their trust in Fiorito to sign documents that they did not understand. By necessity, Fiorito's victims trusted him with a significant amount of discretion over one of their most valuable assets—their homes. *See United States v. Fazio*, 487 F.3d 646, 659 (8th Cir. 2007) ("A position of public or private trust is characterized by professional or managerial discretion, and the abuse of trust enhancement applies where the offender has abused discretionary authority entrusted to the defendant by the victim."). Accordingly, we conclude that the district court did not err in determining that Fiorito occupied a position of trust in relation to his victims and that this trust "significantly facilitated the commission or concealment of the offense." *See* § 3B1.3.

Finally, Fiorito challenges the substantive reasonableness of his sentence. We will reverse a sentence as substantively unreasonable only upon a showing of abuse of discretion. *See Gall*, 552 U.S. at 51. An abuse of discretion occurs "if a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case." *United States v. Haack*, 403 F.3d 997, 1004 (8th Cir. 2005).

The district court varied upward from the guidelines range of 188-235 months and imposed a sentence of 270 months. Fiorito argues that the district court abused its discretion by giving undue weight to the danger he posed to the public. Fiorito concedes that 18 U.S.C. § 3553(a)(2)(C) makes "protect[ing] the public from further crimes of the defendant" a legitimate sentencing consideration, but he argues that, because this factor was represented adequately by his sentencing guidelines range, the district court committed a clear error of judgment in assigning it further, significant weight. We conclude that no such error occurred.

To be sure, the advisory sentencing guidelines aspire to represent adequately the weight of each of the § 3553(a) factors. However, "[w]e have held that a district court may impose an upward variance based on facts already included in the advisory sentencing guidelines where the advisory guidelines do not fully account for those facts." *United States v. Jones*, 509 F.3d 911, 914 (8th Cir. 2007). The district court found an upward variance to be "justified in this case by virtually all of the Section 3553(a) factors" and particularly by "the need to protect the public from Mr. Fiorito." The court noted that Fiorito "poses a unique danger to the public" because he is not only intelligent and articulate but also "extremely dishonest and manipulative." Indeed, the court noted that although Fiorito was only forty-one years old at the time of sentencing, "he has already accumulated . . . 21 adult convictions," most of them based on theft or fraud. As the court put it, Fiorito "has spent most of his adult life lying and stealing." Based on these considerations, we conclude that the district court did not exceed the "range of choice dictated by the facts of the case," *See Haack*, 403 F.3d at 1004, and that Fiorito's sentence of 270 months' imprisonment is not substantively unreasonable.

## III. CONCLUSION

For the above reasons, we affirm Fiorito's conviction and sentence.

_____