**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0569n.06
Filed: August 9, 2007

No. 05-6524

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | WESTERN DISTRICT OF |
| | ) | TENNESSEE |
| **WILBERT T. BETHAL**, | ) | |
| | ) | **O P I N I O N** |
| Defendant-Appellee. | ) | |

BEFORE:   COLE, MCKEAGUE, Circuit Judges; BREEN, District Judge.[*]

**J. DANIEL BREEN, District Judge.**  The United States appeals the district court's order granting the motion of the Appellee, Wilbert T. Bethal, to suppress evidence seized during a search of his residence.  The government contends that the trial court erred (1) in finding that the affidavit supporting the warrant lacked probable cause, and (2) in concluding that the evidence must be suppressed because the officers who searched the residence did not act in "good faith" reliance on the warrant.  We **AFFIRM**.

### I.  BACKGROUND

In August of 2000, the Louisville, Kentucky Police Department began investigating a series

---

[*]The Honorable J. Daniel Breen, United States District Judge for the Western District of Tennessee, sitting by designation.

of gang-related drive-by shootings that had occurred in Louisville in the preceding months. In one of those shootings, which occurred on July 31, 2000, the occupants of a maroon car containing several members of a gang called the "Victory Park Crips" shot at a stopped car in which were riding LaKnogany McCurley, Chicoby Moore, Delion Burks, and Kerry Williams. Burks and Williams, who were known to be members of the "Old Southwick Bloods" gang and who would later be arrested in connection with an alleged retaliatory shooting, were unharmed. Moore was injured, and McCurley, who apparently was not connected with the gang conflict, was killed.

Williams, one of the targets of the shooting, later identified the occupants of the maroon car to Louisville police. He listed the occupants as Thomas Taylor, DeShawn Parker, Norman Parker, and Wilbert Bethal. The Parkers, who are related, as well as Taylor and Bethal, were all known to the police as members of the Victory Park Crips.[1] Taylor was seen on several occasions driving in a maroon or burgundy car.

The rash of shootings between the Bloods and the Crips apparently stemmed from a gang-related murder in 1996. In addition to the shooting on July 31, in May of 2000, unidentified shooters fired on Williams and Burks (Bloods), and Williams was injured; in June of 2002, members of the Crips, including DeShawn Parker, attempted to shoot Williams and Burks in front of the home of Burks's grandmother, who herself was struck several times; and in early July of 2000, Burks and Williams fired at Thomas Taylor (Crips) and Robert Shobe.

---

[1]The Appellee asserts that his name does not appear in the list of Crips members contained in the affidavit of Detective John Tarter of the Louisville Police Department. In fact, the affidavit contains two such lists, and Bethal is identified as a "Crip" in the second. (J.A. at 168). The first list was provided to Detective Tarter by the Louisville Police Gang Squad officers on August 7, before Williams identified Bethal as one of the July 31 shooters, and prior to the August 16 shooting, in which Bethal was also implicated.

Finally, in August of 2000, at least six people, including Michael Johnson, witnessed a drive-by shooting that struck two houses and two cars, and injured an innocent bystander. Johnson identified the shooters as Thomas Taylor, Kenneth Parker, DeShawn Parker, Bethal, and Dominique Coffey (Crips). Officers collected .38 caliber and 9mm shells from the May shooting; 9mm shells and others from the June shooting; 9mm and .45 caliber shells from the early July shooting; and .40 caliber shells from the July 31 shooting.

The police obtained information regarding the incidents from a named informant, Shameka Wright.[2] Wright related that Williams and Burks claimed responsibility for the shooting of Taylor and Shobe. She also told the police that Kenneth Parker sold marijuana, and that he and the other two Parkers stored guns and drugs at a house owned by their grandmother, which Wright had visited numerous times. Additionally, Wright reported that on July 31, prior to the shooting, Kenneth Parker informed her during a phone conversation that he was going to "get" Williams and Burks that night. Wright called Parker after the shooting, and he expressed dismay that the two had survived unharmed. A few weeks prior to the July 31 shooting, Kenneth Parker had offered Wright $5000 to "set up" Williams and Burks, luring them with codeine-containing cough syrup, so that he could arrange for them to be killed.

On October 5, 2000, Detective John Tarter of the Louisville Police Department prepared an affidavit detailing these and other facts gleaned from the investigation of the various shootings, in support of a search warrant for Bethal's residence. The Government conceded at oral argument that the affidavit, which was eight pages in length, was used to obtain search warrants for multiple

---

[2]Appellee peculiarly refers to this witness in his brief as a nameless confidential informant. However, she is an identified informant, and Bethal in fact provides her name a few pages earlier in the same brief.

3

residences, not just Bethal's. In support of probable cause to search Bethal's house, the affidavit contained the following information: (1) a witness claimed Bethal was among the shooters in the incident wherein LaKnogany McCurley was killed, (2) another witness maintained that Bethal was with the shooters in an incident occurring on Cedar Street, (3) a statement from Detective Tarter that he was given a list of gang members containing Bethal's name, and (4) Bethal's current address. While the affidavit contains information from an informant linking "guns and drugs" to a residence located at 2335 West Kentucky Street[3], it provides no similar statements connecting drugs and/or guns to the Bethal's residence.

The warrant, which was signed by a Jefferson County, Kentucky Circuit Judge, authorized officers to search Bethal's residence at 1624 West Breckenridge Street for a "40 Caliber, 9MM Caliber, 45 Caliber, .380 Caliber, Semi-Automatic handguns," as well as "[a]ny and all ammunition" for those or any other weapons, marijuana, and "all contraband, other drugs, and evidence of gang affiliation."

During their execution of the search warrant at the West Breckenridge house, the officers discovered approximately 13 grams of crack cocaine and $3497 in cash. On February 3, 2004,

---

[3]

> The affiant . . . learned from Detective M. Lindeman that on 10/03/00 she interviewed Shameka Wright, a B/F, born 08/05/81, and Shameka Wright related that she has been to 2335 West Kentucky Street on numerous occasions. Shameka Wright states that she knows that the Parkers frequent the address of 2335 West Kentucky, stay there during the daytime and knows that they keep guns and drugs at that location. She states the reason for them being at this location is because it is close to Victory Park, which is the area where they hang. Shameka also relates that the Parkers normally stay around this dwelling until they leave to sleep and then go to their girlfriend's houses.

(J.A. at 169).

Bethal was indicted in the United States District Court for the Western District of Kentucky for one count each of possession of, and possession with intent to distribute, crack cocaine. Appellee moved for the suppression of the fruits of the search, arguing that the affidavit in support of the warrant did not provide probable cause to believe that he was connected to any illegal activity, that it "failed to state with specificity" the items to be sought, and that it was improperly executed, as the officers did not knock and announce before entering Bethal's residence.

After conducting a hearing on the motion to suppress, the magistrate judge recommended that the Appellee's motion be granted, because the affidavit failed to "establish the requisite nexus" between the place to be searched and the evidence sought and because the good faith exception did not apply, since "a reasonably well trained officer" would not have believed that the "bare bones" affidavit established probable cause. The district court adopted the magistrate judge's recommendation and granted the motion, finding that the affidavit did not establish probable cause and that the good faith exception was not applicable. Neither opinion addressed Appellee's knock-and-announce argument. The United States now appeals the grant of the motion to suppress.

## II. ANALYSIS

### A. Standard of review

We review decisions to suppress evidence "'to ensure that the magistrate had a substantial basis for concluding that probable cause existed.'" United States v. Laughton, 409 F.3d 744, 747 (6th Cir. 2005) (quoting Illinois v. Gates, 462 U.S. 213, 238-39, 103 S. Ct. 2317, 2332 (1983)). "When reviewing the denial of a motion to suppress, we defer to a district court's findings of fact unless they are clearly erroneous, and we review the court's conclusions of law de novo." Laughton, 409 F.3d at 747 (citing United States v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004)).

**B. Discussion**

Contrary to the district court's finding, the Government claims that the affidavit was not deficient because the facts contained within it established probable cause to believe that evidence of a crime could by found at Bethal's residence. In the event we conclude the affidavit did not support the issuing magistrate's probable cause determination, the United States asserts that we should nevertheless conclude that the officers' reliance on the warrant was in "good faith," thereby precluding the district court's application of the exclusionary rule. See, e.g., United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405 (1984) (delineating the "good faith" exception to the exclusionary rule).

The Appellee contends that the district court did not err in finding the affidavit lacked probable cause. Bethal claims the affidavit contains no information establishing a "nexus of any type connecting [his] home with the crimes" except for the fact that he lived there. Because the affidavit was utterly devoid of information linking his home with any crime, Bethal asserts it was unreasonable for the executing officers to have relied on it. The Appellee further insists that the "good faith" exception was inapplicable in his case.

**1.       The Probable Cause Determination**

The Fourth Amendment mandates that a search warrant be based "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In order to establish probable cause to search, a warrant request must "state a 'nexus between the place to be searched and the evidence sought.'" United States v. Van Shutters, 163 F.3d 331, 336-37 (6th Cir. 1998) (quoting United States v. Alix, 86 F.3d 429, 435 (5th Cir. 1992)). The belief that the items sought will be found at

the location to be searched must be "'supported by less than prima facie proof but more than mere suspicion.'" United States v. Johnson, 351 F.3d 254, 258 (6th Cir. 2004) (quoting United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990)). However, "even a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit." Davis v. Gracey, 111 F.3d 1472, 1478 (10th Cir. 1997) (citations and internal quotation marks omitted).

> In determining whether an affidavit establishes probable cause, the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

United States v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004), cert. denied, 543 U.S. 851, 125 S. Ct. 261 (2004) (quoting Illinois v. Gates, 462 U.S. 213, 238-39, 103 S. Ct. 2317 (1983)). A court is instructed to refrain from reviewing a search warrant affidavit in a "hypertechnical" manner or engaging in "line-by-line scrutiny." Instead, courts are to consider "whether the totality of the circumstances supports a finding of probable cause." Woosley, 361 F.3d at 926. The issuing judge's determination as to probable cause is to be afforded "great deference" and should be overturned "only if [he] arbitrarily exercised his discretion." Id. "The issuing judge or magistrate may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996) (citations and internal quotation marks omitted). "[I]n seeking suppression of evidence the burden of proof is upon the defendant to display

7

a violation of some constitutional or statutory right justifying suppression." Rodriguez-Suazo, 346 F.3d at 643 (citation omitted).

### a. Weapons and Drugs

The magistrate judge stated in his recommendation, adopted by the district court, that a place may not be searched merely because a criminal suspect resides there. The United States, however, relies upon drug cases where we concluded that probable cause did exist to support the issuance of a search warrant for a suspect's residence.

In United States v. Davidson, 936 F.2d 856, 860 (6th Cir. 1991), we held that there was probable cause to search because the information in the affidavit "created a 'fair probability' that [the defendant] was engaged in the distribution of illegal drugs, and the magistrate reasonably inferred that evidence would be found at [the defendant's] residence." In Davidson, despite the fact that "officers did not observe drugs or evidence going into or out of [Davidson's] apartment on any occasion," the affidavit contained detailed statements from surveillance agents of meetings between suspected drug dealers at restaurants and their residences[4], including overhearing inculpatory statements. 936 F.2d at 858. Moreover, the affiant stated that based upon his experience and training "he had probable cause to believe that Davidson, in association with . . . others, was conducting an illicit narcotics business from his residence." Id.

In United States v. Miggins, 302 F.3d 384 (6th Cir. 2002), we also concluded that the affidavit in question provided probable cause for the search of a residence. The court noted that the affidavit sufficiently connected the place to be searched with those suspected of distributing cocaine. Id. at 393. In support of its conclusion that probable cause to search existed, we cited case law from

---

[4]Some of the meetings occurred at Davidson's apartment. Davidson, 936 F.2d at 856.

the First, Second, Fourth, Seventh, Eighth, Ninth, and D.C. Circuits, as well as our opinion in Davidson. Among the cases quoted was United States v. McClellan, 165 F.3d 535, 546 (7th Cir. 1999), which held that "in issuing a search warrant, a magistrate is entitled to draw reasonable inferences about where the evidence is likely to be kept . . . and . . . in the case of drug dealers evidence is likely to be found where the dealers live."

Continuing with this reasoning, in United States v. Newton, 389 F.3d 631 (6th Cir. 2004), vacated on other grounds, 126 S. Ct. 280 (2005), we held:

> Given that probable cause generally exists to search for the fruits and instrumentalities of criminal activity at the residence of a drug dealer with continual and ongoing operations, the judge's decisions as to these locales cannot be said to have been arbitrary. Detailed evidence of [the defendant's] operations was provided to the judge. The police then supplied him with evidence that these addresses were locations where [the defendant] was maintaining a residence. Without regard to any other information in the affidavit, probable cause existed to issue the warrant in relation to these three presumed residences of [the defendant].

Id. at 636.

The following year, we revisited the issue of searching a residence based on the status of the suspect in United States v. Frazier, 423 F.3d 526 (6th Cir. 2005). In Frazier, the defendant was suspected of running a drug distribution ring. A confidential informant made two drug purchases from third parties at the house in question. On the first occasion, the informant accompanied the seller to the defendant's residence, where the seller obtained the contraband. Id. at 529-30. At the second transaction, the informant visited the defendant's residence to purchase drugs, where the defendant himself found a seller for the informant. Id. at 530. Although the informant was wearing a "wire" during both transactions, so that police were able to record the exchanges, neither this fact

9

nor any other information establishing the informant's reliability was mentioned in the affidavit. Id. at 530, 532. The defendant was later evicted from the house where the informant bought drugs, but he established a new location elsewhere. Id. at 530. Police obtained a warrant to search the defendant's second residence.

In analyzing the constitutionality of the search, the Frazier court stated that the fact "'that the owner of the property is suspected of crime'" is not sufficient to create probable cause; rather, there must be "'reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought.'" Id. at 532 (quoting Zurcher v. Stanford Daily, 436 U.S. 547, 556, 98 S. Ct. 1970, 1976-77 (1978)). In response to the government's citation of contrary case law, we determined that

> [n]one of these cases, however, supports the proposition that the defendant's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home. Where, as here, the warrant affidavit is based almost exclusively on the uncorroborated testimony of unproven confidential informants (none of whom witnessed illegal activity on the premises of the proposed search), the allegation that the defendant is a drug dealer, without more, is insufficient to tie the alleged criminal activity to the defendant's residence.

Id. at 533.[5]

---

[5]With regard to three of the cases the government cited in Newton, the fact that drug dealers often keep drugs in their homes was noted only as additional support for the court's finding of probable cause, which was based on information other than the suspect's mere presence in the place to be searched. See United States v. Blair, 214 F.3d 690, 696 (6th Cir. 2000) (experienced officer stated that drug traffickers keep financial records at their homes); United States v. Jones, 159 F.3d 969, 974 (6th Cir. 1998) (defendant had sold drugs to a confidential informant in his driveway); United States v. Caicedo, 85 F.3d 1184, 1193 (6th Cir. 1996) (experienced officer stated that drug dealers often keep drugs at their homes). However, the fourth case cited by the government, Miggins, appears to provide support for the proposition that a person suspected of dealing drugs may alone provide sufficient probable cause to search his residence. Miggins, 302 F.3d at 393-94 (collecting cases and stating, "'[i]n the case of drug

In light of the <u>Frazier</u> court's finding that where a warrant affidavit is based on the unsubstantiated testimony of confidential informants, the defendant's drug dealer status alone does not establish probable cause, <u>Frazier</u> does not appear inconsistent with our prior holdings. It merely requires that the information in the warrant be provided by sources whose reliability is apparent in the affidavit itself. <u>Id.</u> at 532-34. This would leave undisturbed the rule from <u>Newton</u> that the fact that a defendant who is a drug dealer with "continual and ongoing operations" in and of itself creates probable cause to search his home.

Finally, we again addressed the question in the recent decision of <u>United States v. McPhearson</u>, 469 F.3d 518 (6th Cir. 2006). In <u>McPhearson</u>, police officers sought to arrest the defendant at his residence for simple assault. 469 F.3d at 520. McPhearson appeared at the door upon the officers' knock. <u>Id.</u> After determining the defendant's identity, the officers arrested and searched him, which revealed the presence of crack cocaine in his front pocket. <u>Id.</u> Thereafter, the arresting officers sought and obtained a search warrant for the defendant's house. <u>Id.</u> at 520-21. The affidavit supporting the issuance of the warrant recited only the arresting officers' discovery of drugs on the defendant during the search incident to arrest. <u>Id.</u>

In affirming the district court's suppression of the cocaine, we stated,

> [t]he government argues that McPhearson's arrest outside his home with drugs on his person was sufficient to establish a fair probability that his residence would contain evidence of wrongdoing. The argument depends on an inference that "an individual arrested outside his residence with drugs in his pocket is likely to have stored drugs and related paraphernalia in that same residence." (Gov't's Br. 11.) This inference can be drawn permissibly in some cases, as evidenced by <u>United States v. Miggins</u> and the cases cited therein. 302 F.3d 384,

---

dealers, evidence is likely to be found where the dealers live'") (emphasis deleted) (quoting <u>United States v. Henson</u>, 123 F.3d 1226, 1239 (9th Cir. 1997)).

393-94 (6th Cir. 2002). But in all those cases, the affidavits contained an additional fact that permitted the magistrate to draw the inference that evidence of wrongdoing would be found in the defendants' homes--namely, the independently corroborated fact that the defendants were known drug dealers at the time the police sought to search their homes. See, e.g., United States v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999) (finding it reasonable to infer that a known drug dealer would store evidence of his trade at home); United States v. McClellan, 165 F.3d 535, 546 (7th Cir. 1999) ("[I]n issuing a search warrant, a magistrate is entitled to draw reasonable inferences about where the evidence is likely to be kept . . . and . . . in the case of drug dealers evidence is likely to be found where the dealers live.").

Id. at 524-25.

In this case, the affidavit only contained information connecting the appellant to two shootings; it did not include any facts connecting him to drugs or to weapons at his home other than his alleged status as a gang member and known acquaintance of the Parkers who reportedly kept drugs and guns in their residence at 2335 West Kentucky Street.[6] Because the affidavit did not provide a sufficient factual basis from which a magistrate could draw a reasonable inference that Bethal kept drugs or weapons at his home, this case is distinguishable from Davidson, Miggins, Newton, and Frazier.[7] Here, while the affidavit contained sufficient information to support a

---

[6]Concerning Bethal's participation in the shootings, the affidavit states that "DeShawn Parker, Norman Parker, Wilbert Beth[a]l, and Thomas Taylor were the people that shot into the car causing LaKnogany McCurley's death . . . ." (J.A. at 167). However, the affidavit does not state that Bethal was known to keep guns (or drugs) at his residence. Neither is there a statement from the affiant or any other law enforcement officer that as a gang member, Bethal would likely have had a gun in his home.

[7] In his dissent, Judge McKeague looks to our precedent establishing that probable cause exists to search the home of a suspect who is a known "drug dealer with continual and ongoing operations" and concludes that because gang members are known to participate in continuing criminal enterprises, it was reasonable for the issuing magistrate to infer that Bethal "was likely to keep the relevant evidence of gang activity where he lived." Dissent op. at 1, 3. (citing Newton, 389 F.3d at 636; Miggins, 302 F.3d at 393-94).
However, in contrast to the possession of illicit narcotics, neither a suspect's membership

12

probable cause finding for the issuance of an arrest warrant for Bethal for the two drive-by shootings,

it did not meet that standard upon which to base a search for weapons or drugs in Bethal's home.

We have observed that suspects identified as drug dealers routinely keep drugs at home. See,

e.g., McClellan, 165 F.3d at 546; United States v. Jones, 159 F.3d 969, 974 (6th Cir. 1998).

However, persons accused of murders often dispose of the guns utilized in the crime soon afterward.[8]

---

in a gang nor his retention of a weapon in his home, constitutes, ipso facto, criminal activity. Indeed, the dissent admits as much with regard to a defendant's status as a gang member. Dissent op. at 2. To extend the Newton precedent, see Davidson, 936 F.2d at 860 (validating the issuance of a warrant where the information in the affidavit established only that the suspect was a drug dealer), to gang members based on the hypothesis that such individuals are often known to similarly engage in "continual and ongoing [criminal] operations" would be to grant law enforcement authority to search the residence of any member of a group, who although linked to particular criminal activity, had not been shown to maintain an instrumentality of that crime in his home, nor apt to do so. We believe probable cause requires a greater nexus between the evidence sought and the location to be searched in order to comport with the Fourth Amendment. See United States v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (stating that probable cause for the issuance of a search warrant requires a "nexus between the place to be searched and the evidence sought"); see also Illinois v. Gates, 462 U.S. 213, 238-39, 103 S. Ct. 2317 (1983) (holding that the information contained in the affidavit must indicate to a "fair probability" why the evidence of criminal activity will be found "in a particular place").

[8]The dissent disputes that Bethal was more likely to dispose of his gun, arguing that because Bethal was also a target of retaliatory shootings, he would have probably retained a gun at his home. Dissent op. at 6. In this case, however, the affidavit provided no information that Bethal, unlike the Parkers, possessed a gun at his residence or that, more generally, gang members usually keep guns in their homes. Therefore, the issuing magistrate had to infer that because of Bethal's status as a gang member, he would likely preserve guns and ammunition from the shooting at his home. Because the affidavit contained nothing to link Bethal's residence to any instrumentality of the drive-by shootings, the inference drawn by the magistrate was impermissibly based on "mere suspicion." Johnson, 351 F.3d at 258.

Moreover, the reviewing magistrate, in drawing an inference that Bethal would likely have kept evidence related to the shootings at his residence, would have in course read the following information in the affidavit:

> The affiant met with Randall Curry[, a confidential informant,] and
> obtained the following information: Randall Curry related that a
> few days after the girl was killed in front of Jewish [Hospital], he

13

See, e.g., Williams v. Withrow, 944 F.2d 284, 286 (6th Cir. 1991), rev'd on other grounds, 507 U.S. 680 (1993) (gun thrown in river); Smith v. Commonwealth, 599 S.W.2d 900, 902 (Ky. 1980) (gun thrown in levy). Additionally, as the Newton court observed, "with continuing criminal operations . . . the lack of a direct known link between the criminal activity and [the] residence[] [to be searched] becomes minimal." 389 F.3d at 635-36. The affidavit here, however, provided no indication that at the time of the search, Bethal was still participating in gang-related shootings, or was seen carrying a gun. It only asserted that Bethal was identified as one of the drive-by shooters, that he was a gang member, and that he lived at 1624 West Breckenridge Street. The "continuing operation" theory noted in Davidson, Miggins, and Newton does not exist here based upon the factual declaration contained in the affidavit. Because the affidavit fails to establish any relationship between Bethal's residence and the fair probability that weapons and drugs would be found there, no probable cause existed to support the issuance of the search warrant as to these items.[9]

---

spoke with Kenneth Parker who he also knows as "Wee Double." Randall Curry stated that he was talking to Kenneth Parker about where his big gun was and Parker said he had to throw it away because the girl [LaKnogany McCurley] got killed in front of Jewish Hospital.

(J.A. at 168) (emphasis added). We note Parker's action in disposing of the weapon he used during the murder of McCurley mirrors the conduct of the shooters in Williams, 944 F.2d at 286, and Smith, 599 S.W.2d at 902. The fact that a shooter would normally discard the evidence linking himself to the criminal event is in contrast to drug dealers who routinely maintain evidence in their residences related to their crimes. See McClellan, 165 F.3d at 546 (holding that the reviewing magistrate "was justified in inferring that [because] McClellan was engaged in marijuana trafficking[, ] . . . marijuana might very well be found in his Tucson home").

[9]The dissent relies upon a decision of this court which observed that "individuals who own guns keep them at their homes," United States v. Smith, 182 F.3d 473, 480 (6th Cir. 1999), for support of his position that Bethal would most likely have kept a gun and ammunition at home. Dissent op. at 6. Smith, however, concerned a search warrant for weapons based upon an informant's observing the defendant with two specific guns at a specific address, the suspect's

14

Turning to the government's "good faith" argument, the Supreme Court has decided that, in view of the policies behind the exclusionary rule, "reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate . . . should be admissible in the prosecution's case in chief" even if the warrant was not in fact supported by probable cause. Leon, 468 U.S. at 913. This "good faith" exception to the exclusionary rule permits the admission of evidence obtained from the execution of an invalid search warrant except:

> (1) when the warrant is issued on the basis of an affidavit that the affiant knows (or is reckless in not knowing) contains false information; (2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; [or] (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid.

United States v. Laughton, 409 F.3d 744, 748 (6th Cir. 2005) (citing Leon, 468 U.S. at 914-23, 104 S. Ct. 3405). This court has analyzed the third and fourth situations as a single exception to Leon's rule of admissibility. See United States v. Rodriguez-Suazo, 346 F.3d 637, 645 (6th Cir. 2003).

In this case, as in McPhearson, the district court applied the third limitation on the "good faith" exception that "prevents introduction of evidence seized under a warrant that is issued on the basis of a 'bare bones' affidavit." 469 F.3d at 525. "A bare bones affidavit is one that merely 'states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'" Id. at 526 (quoting United States v. Weaver, 99 F.3d 1372, 1378 (6th Cir. 1996)). "Determining whether the affidavit is so bare bones as to preclude application of the good-faith exception is a less demanding inquiry than the one

---

home. Obviously the facts in this case do not fall into that scenario.

15

involved in determining whether the affidavit provided a 'substantial basis' for the magistrate's conclusion of probable cause." Id.

We conclude the affidavit at issue was "so lacking in indicia of probable cause" that weapons or drugs could be seized from Bethal's residence "that a belief in its existence [was] objectively unreasonable." In McPhearson, we found that the good faith exception was inapplicable because the affidavit did not contain "a minimally sufficient nexus between the illegal activity and the place to be searched to support an officer's good faith belief in the warrant's validity, even if the information provided was not enough to establish probable cause." Id. (quoting United States v. Carpenter, 360 F.3d 591, 596 (6th Cir. 2004)). Similarly, the affidavit here failed to contain a minimally sufficient nexus between the illegal activity (drive-by shootings) and Bethal's home. In fact, it established no connection whatsoever. Therefore, the district court was correct in determining that the affidavit did not provide the executing officers a good faith basis to believe in its validity.[10]

**b. Evidence of Gang Affiliation**

The magistrate judge's opinion suggests that the search for evidence of gang association was improper because the affidavit failed to establish suspicion that Bethal's gang membership, of itself, violated the law. However, items to be searched need not necessarily be "contraband" or the "fruits" of a crime; any evidence may be seized provided there is probable cause "to believe that the evidence

---

[10]In his dissent, Judge McKeague maintains as a logical deduction from the notion that persons who own guns keep them at their home, officers could naturally assume Bethal had guns in his residence. Citing Laughton, the dissent contends that the facts of this case do not comport with our decision therein that the good faith exception did not apply. However, like Laughton, the affidavit in this case contained no assertion that the informant ever saw guns at Bethal's residence as she had observed at another shooter's house or that Bethal intended to retaliate against others. Likewise, in McPhearson, also cited by the dissent, there was no indication in the affidavit that Bethal's home was tied to criminal activity or that based on police experience, guns would likely be found there. McPhearson, 469 F.3d at 527.

sought will aid in a particular apprehension or conviction." Warden v. Hayden, 387 U.S. 294, 307, 87 S. Ct. 1642, 1650 (1967).

In United States v. Jackson, a local magistrate issued an "indicia" warrant for "evidence of street gang membership or affiliation with any street gang." 67 F.3d 1359, 1365 (8th Cir. 1995). The warrant was based upon an affidavit of an investigating officer who recounted the report of a victim who claimed to have been kidnapped and threatened by a member of a gang known as the "Disciples." Id. The warrant application and the warrant dealt only with evidence of gang affiliation. Id. On appeal, the court noted that "the warrant violated the Fourth Amendment because it failed to describe the items to be seized with requisite particularity."[11] Id. at 1366. The court, however, concluded that the evidence seized was nevertheless admissible under Leon because

the warrant specified that the search was motivated by an alleged

[11]The warrant in Jackson authorized the officers to search for the following evidence of gang affiliation with the Black Gangster Disciples:

Any evidence of street gang membership of [sic] affiliation with any street gang, including, but not limited to, any drawing or miscellaneous writings regarding or evidencing gang membership; or objects or graffiti depicting gang members [sic] names, initials, logos, monikers, slogans, or containing mention of street gang membership, affiliation, activity, or identity; any paintings, drawings, photographs, or photograph albums depicting persons, vehicles, weapons or locations which may appear upon observation to be relevant on the questions of gang membership or association, or which may depict items sought and/or believed to be evidence of any criminal activity; and newspaper clippings tending to relate details or reference to any crime; and any address books, lists of, or single references to, addresses or telephone numbers of persons who may later be determined to belong to or be associated with any street gang.

67 F.3d at 1365 n.1.

17

> kidnapping by the Disciples. The place to be searched was [the accused's], where [the victim's] kidnappers had allegedly taken him. The warrant also specified that [a specific person] would be found on the premises with particular items of gang paraphernalia. Because we find that the officers' reliance on the warrant was not objectively unreasonable, Jackson's argument for suppression must fail.

Id. (emphasis added); see also San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962 (9th Cir. 2005) (recognizing, but not ruling on, the propriety of a search for "any evidence of membership in, affiliation with, activity of, or identity of, any gang" in a case where the sole probable cause determination was based upon the prosecution's desire to use evidence of gang affiliation as a factor in sentence enhancement).

We conclude that in this case, like in Jackson, the warrant fails to meet the Fourth Amendment's particularity requirement because it authorizes a search for any "evidence of gang affiliation." We also find that the Leon exception is not applicable under these facts. Here, the warrant is even more generalized than the one in Jackson, see supra at 15 n.6, and unlike in Jackson, the affidavit under review contains no statement that a person "would be found on the premises with particular items of gang paraphernalia." Jackson, 67 F.3d at 1366. Further, although the affidavit states that Bethal's name was among those given during a task force meeting as a member of the "Victory Park Crips," it is devoid of any information regarding whether a search of his home would likely reveal specific evidence of his gang affiliation or what form such evidence would take.

## 2. The Plain View Exception

The government contends in its reply brief that even if the search for drugs was not otherwise valid, "the drugs were found in plain view in areas where the officers legitimately searched for guns and ammunition." Because we have concluded that the search of Bethal's residence violated the

18

Fourth Amendment, the government's plain view exception argument is also without merit. See

United States v. Reed, 141 F.3d 644, 649 (6th Cir. 1998) (recognizing that contraband in plain view

may be seized as long as the seizing officer's presence was legal); accord United States v. Baldwin,

621 F.2d 251 (6th Cir. 1980).

### 3.     The Affiant's Inclusion of False Statements in the Affidavit

The Appellee maintains that the affidavit in this case contained recklessly false information,

because Detective Tarter, the affiant, did not "verify these 'tipsters'" who identified him as a shooter

in the July 31 and August shootings; and, because the affidavit mentions neither that Williams

testified before the grand jury that he never identified Bethal to the police, nor that Johnson was

inside a building during the August shooting.  The Supreme Court in Franks v. Delaware, 438 U.S.

154, 98 S. Ct. 2674 (1978), defined the showing necessary to challenge a warrant on the ground that

the affidavit contains knowingly or recklessly false information.  To support such a theory, "the

defendant must make a substantial preliminary showing that a false statement knowingly and

intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant

affidavit . . . ."  Rodriguez-Suazo, 346 F.3d at 648 (quoting Franks, 438 U.S. at 155-56, 98 S. Ct.

2674)).  This substantial showing "must overcome the presumption that the affidavit is valid," and

"[t]he intentionally or recklessly false statement must be made by the affiant h[im]self, not the non-

governmental informant."  Id.

Thus, Bethal would have to show that Detective Tarter knew or should have known that the

information he included in the affidavit was false.  Detective Tarter stated in the affidavit that

Johnson identified the defendant as one of the perpetrators in the August drive-by shooting.  The

Appellee argues that Johnson could not have seen him, because Johnson told the police on another

19

occasion that he was inside a building at the time of the shooting, and in order to identify the shooters, he would have to be able to see through doors.

This statement in the affidavit is neither knowingly nor recklessly false provided that Detective Tarter reasonably believed that Johnson actually identified Bethal – which is all the affidavit asserts. Detective Tarter could reasonably have believed that Johnson was lying when he said that he was indoors – or that, though Johnson could not see through doors, he can see through windows. Defendant makes no showing regarding Detective Tarter's knowledge. As in Rodriguez-Suazo, "[e]ven if some of the information contained in the search warrant ultimately could be shown to be false, [the defendant] provided no evidence that [the officer] intentionally or recklessly misrepresented facts in order to secure the search warrant." 346 F.3d at 648.

Bethal also contends that Williams testified before the grand jury that he (Williams) never made any statement identifying defendant, and notes that Detective Tarter omitted this information from his affidavit. In view of the fact that the affidavit was prepared on October 9, 2000, and that the Appellee was not indicted until 2004, the omission hardly qualifies as deceptive. The affidavit does clearly explain that although Williams initially told police officers that he was asleep during the July 31 shooting, he said upon being arrested and questioned that, in fact, he was not asleep and could identify the shooters.

In any event, we have addressed a similar situation to Williams' changed version of events in United States v. Cummins, 912 F.2d 98 (6th Cir. 1990). In that case, the affidavit stated that a confidential informant had seen the defendant in an apartment in possession of cocaine. Cummins, 912 F.2d at 102. At a later suppression hearing, the officer who had spoken directly with the informant testified that the informant had never made such a statement. Id. We held that "this

20

discrepancy does not support a finding of deliberate falsehood or reckless disregard for the truth." Id. at 102-03. Because Bethal did not examine the affiant at the suppression hearing, and because "the discrepancy itself can be explained as a lapse of memory by [the officer who testified] or a misunderstanding by [the affiant],"Bethal's "proofs fail to demonstrate that the affiant swore falsely or with reckless disregard for the truth." Id. at 103.

In this case, the testimony disavowing the statement in the affidavit was made four years later by a witness who was vulnerable not merely to a lapse of memory, but a strong motivation not to incriminate gang members. Further, the Appellee here did examine Detective Tarter regarding the statement in the affidavit – and Detective Tarter reaffirmed that statement, and offered the name of another officer from whom his information came (and whom Bethal never questioned to see whether he would confirm Detective Tarter's testimony). The Appellee's proof here, like that offered in Cummins, fails to demonstrate that the affiant swore falsely or with reckless disregard for the truth. Thus, he is not entitled to relief on this issue.

**4.  Executing Officers' Failure to Knock and Announce**

It is undisputed that the officers executing the warrant entered defendant's residence without knocking and announcing their presence. Defendant contends that this entry violated the so-called "knock-and-announce" rule. The rule requires officers to "announce their presence and provide residents an opportunity to open the door," unless the officers have a reasonable suspicion that "'circumstances present a threat of physical violence,' or . . . there is 'reason to believe that evidence would likely be destroyed if advance notice were given,' or . . . knocking and announcing would be 'futile.'" Hudson v. Michigan, __ U.S. __, __, 126 S. Ct. 2159, 2162-62 (2006) (citations omitted) (quoting Richards v. Wisconsin, 520 U.S. 385, 394, 117 S. Ct. 1426, 1421 (1997)).

21

As the government notes in its reply brief, because the district court found that the officers did not rely in good faith on the warrant's validity, it made no findings on whether one of the exceptions to the knock-and-announce requirement applied. However, it is not necessary to remand for an examination of this issue by the district court, because the Supreme Court recently decided in Hudson that violations of the knock-and-announce rule do not require suppression of evidence. Id. at __, 126 S. Ct. at 2168 ("In sum, the social costs of applying the exclusionary rule to knock-and-announce violations are considerable; the incentive to such violations is minimal to begin with, and the extant deterrences against them are substantial-incomparably greater than the factors deterring warrantless entries when Mapp[ v. Ohio, 367 U.S. 643, 81 S. Ct. 1684 (1961),] was decided. Resort to the massive remedy of suppressing evidence of guilt is unjustified.").

## CONCLUSION

Based upon the foregoing, we affirm the order of the district court suppressing the evidence seized during a search of the Appellee's residence.

**McKEAGUE, Circuit Judge, dissenting.** I agree with the majority's synopsis of this court's prior cases regarding probable cause to search a defendant's residence. However, I would hold that based on that precedent, the affidavit established probable cause to search Bethal's residence; and that, even if there were not probable cause, the fruits of the search are admissible under the good faith exception.

## I. PROBABLE CAUSE

As an initial matter, I note that "reviewing courts are to accord the [issuing] magistrate's determination" that probable cause exists "'great deference.'" *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). As the en banc court explained in *Allen*, the Supreme Court "soundly rejected '[a] grudging or negative attitude by reviewing courts toward warrants,'" because "a hypertechnical critique of warrants w[ill] only, in the end, encourage warrantless searches, undermining the very Fourth Amendment right such an approach would seek to protect." *Id.* (quoting *Gates*, 462 U.S. at 236) (first alteration in original). In this case, prior to searching Bethal's residence, the officers prepared an affidavit and submitted it to a Jefferson County, Kentucky Circuit Court judge, who issued a search warrant.

### A. Status as a gang member

As the majority opinion explains, this court's precedent establishes that probable cause to search a defendant's home exists where the defendant is "a drug dealer with continual and ongoing operations." *Newton*, 389 F.3d at 636; *see also Miggins*, 302 at 393-94. However, "the allegation that the defendant is a drug dealer" by an "unproven confidential informant, . . . without more," is

23

insufficient to establish probable cause to search a defendant's residence.[12] *Frazier*, 423 F.3d at 533; *see also McPhearson*, 469 F.3d at 524 (probable cause would exist based on "the independently corroborated fact that the defendants were known drug dealers at the time the police sought to search their homes").[13] Additionally, probable cause does not exist to search a defendant's residence where the defendant possesses drugs but there is no allegation that he is a drug *dealer*. *McPhearson*, 469 F.3d at 521, 525 (warrant based on affidavit stating that the defendant had been arrested on a warrant for "simple assault," and at the time had had in his pocket a clear plastic bag containing 6.4 grams of crack cocaine).

This court has not yet addressed the issue of whether criminal status other than that of a drug dealer indicates a "continual and ongoing operation," the evidence of which "is likely to be found where the [defendant] live[s]." *Newton*, 389 F.3d at 636; *Miggins*, 302 F.3d at 394 (quoting *McClellan*, 165 F.3d at 546). In this case, Bethal was identified as a gang member, which is not itself illegal. However, in addition, he was identified as involved in gang-related criminal activity:

---

[12]The majority paraphrases this holding as referring to a "confidential informant," Opinion at 11, but that is not what *Frazier* says; it refers, expressly, to an *unproven confidential* informant. Neither the named informant nor the narcotics officers in this case are unproven confidential informants.

[13]With regard to the majority's analysis of the relationship between this court's prior holdings in *Newton* and *Frazier*, I note that "when a later decision of this court conflicts with one of our prior published decisions, we are still bound by the holding of the earlier case." *Darrah v. City of Oak Park*, 255 F.3d 301, 310 (6th Cir. 2001) (citing *Sowards v. Loudon County*, 203 F.3d 426, 431 n.1 (6th Cir. 2000); *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 180 F.3d 758, 765 (6th Cir. 1999)). Thus, the majority's explanation that *Frazier* "merely requires that the information in the warrant be provided by sources whose reliability is apparent in the affidavit itself," Opinion at 11, is correct. Insofar as *Frazier* could be read to contradict the holding in *Newton* that "probable cause generally exists to search for the fruits and instrumentalities of criminal activity at the residence of a drug dealer with continual and ongoing operations," 389 F.3d at 636, this court is bound to follow *Newton*.

specifically, two drive-by shootings. The police sought at his residence guns, ammunition, gang paraphernalia, and drugs. Thus, probable cause to search existed if Bethal's status as a gang member indicated continual and ongoing criminal operations, and he was likely to keep the relevant evidence of gang activity where he lived.

Clearly, drug dealers often engage in continuing operations. This court has had occasion to observe that "drug dealers usually continue their trade after moving to a new residence," *Frazier*, 423 F.3d at 537, and has dealt with offenders who continued selling drugs after their residence was searched and they had to move their operations elsewhere, *United States v. Bowen*, 194 F. App'x 393, 400 (6th Cir. 2006); after being arrested, *United States v. Mitchell*, 63 F. App'x 224, 228 (6th Cir. 2003); after six different incarcerations, some for drug offenses, *United States v. Chapman*, 112 F. App'x 469, 471, 472 (6th Cir. 2004); and after their drug-dealing partners were convicted, *United States v. Robertson*, 67 F. App'x 257, 262 (6th Cir. 2003).

Gang members likewise often engage in continuing criminal operations. Gang members may join as young as their early teens, or even younger. *State v. Brown*, 796 N.E.2d 506, 513 (Ohio 2003) (the defendant belonged to the "Baby Crips" as a child); *State v. Drummond*, No. 05-MA-197, 2006 Ohio App. LEXIS 6997, at *28-29 (Ohio Ct. App. Dec. 20, 2006) (in the eleven years since the defendant joined the Lincoln Knolls Crips at thirteen, he had "witnessed much shooting, death and other violence such as hand-to-hand fights," and "been shot five times . . . at age sixteen, causing his leg to be amputated"). Gang members typically display significant loyalty to the gang, as a result of which many refuse to testify against one another, *United States v. Roberson*, 474 F.3d 432, 435 (7th Cir. 2007); take the blame for the criminal offenses of higher-status members, *United States v. Padilla*, 387 F.3d 1087, 1090 (9th Cir. 2004); or commit serious crimes, including killing police

25

officers or their own close friends, to indicate their loyalty, *Grider v. Abramson*, 180 F.3d 739, 744 (6th Cir. 1999); *United States v. Bazemore*, 41 F.3d 1431, 1433 (11th Cir. 1994).

Gangs, including the Crips and the Bloods, tend to build an internal "culture," which influences the decision-making of their members. *Drummond*, 2006 Ohio App. LEXIS 6997, at *28. They usually use "gang color," which may include particular colors or symbols, to create a group identity, and also employ permanent markings such as tattoos to indicate the status of members according to a code that other members understand. *Rios v. Rocha*, 299 F.3d 796 , 800 n.5 (9th Cir. 2002) (Crips wear blue "rags" or bandanas and Bloods wear red); *Adams by Adams v. Township of Redford*, No. 95-1279, 1996 U.S. App. LEXIS 14473, at *2-3 (6th Cir. May 10, 1996) ("[A] gang's 'colors' are an integral part of its identity."); *State v. Earl*, 702 N.W.2d 711, 716 (Minn. 2005) (tear drop tattoo near the eye indicates that the possessor has killed one person).

Gangs generally aggressively defend their geographic territory, and even accidentally displaying the colors of a rival gang on a gang's "turf" can be an offense punishable by death. *See State v. Winton*, No. 98-AP-1036, 1999 Ohio App. LEXIS 3364, at *2-3 (Ohio Ct. App. July 22, 1999) (high school student shot while waiting to pick his brother up at a school bus stop because a high school-age "Blood" saw a black bandana he was trying to conceal). Finally, like drug dealing, gang affiliation frequently persists after incarceration.[14] *See, e.g.*, *Walker v. Gomez*, 370 F.3d 969,

---

[14]In fact, gang activity in prison may be more serious than gang activity on the streets. As the Supreme Court has recently observed,

> Clandestine, organized, fueled by race-based hostility, and committed to fear and violence as a means of disciplining their own members and their rivals, gangs seek nothing less than to control prison life and to extend their power outside prison walls. Murder of an inmate, a guard, or one of their family members on the outside is a common form of gang discipline and control, as well as a condition for membership in some gangs. Testifying against, or otherwise informing on,

26

971-72 (9th Cir. 2004) (incarcerated members of the East Coast Crips engaged in a series of attacks on prison staff); *United States v. Keys*, 899 F.2d 983 (10th Cir. 1990) (prisoner told guard "that he was a Crips member with sixty soldiers in the prison system" who would kill the guard at the prisoner's request).

In view of the characteristics of gang activity repeatedly recognized by the courts, it is reasonable to conclude that, like a drug dealer, a gang member who is known to be currently engaged in criminal activity is involved in a "continual and ongoing operation." In this case, the affidavit contained significant information that Bethal was involved in ongoing criminal activity. He was identified by the Louisville Police Department Gang Squad as a gang member, and witnesses stated that he was involved in two different drive-by shootings along with his fellow Crips: the July 31, 2000, shooting in which LaKnogany McCurley was killed, and another shooting the next month in which no one was killed but an innocent bystander was struck. In addition to these two shootings, the task force investigated three others between Crips and Bloods, and the named informant explained that the retaliatory shootings dated back to a murder in 1996. Defendant's residence was searched less than two months after the second of the shootings in which he was implicated. Thus, at the relevant time, Bethal was a gang member known to be involved in ongoing criminal operations. *See United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990) (two instances of drug dealing four months apart "are close enough in time to infer" that defendants are engaging in continuing operations "in the interim").

## B. Likelihood of finding evidence at the defendant's home

gang activities can invite one's own death sentence.

*Wilkinson v. Austin*, 545 U.S. 209, 227 (2006) (citations omitted).

*1. Weapons and ammunition*

The second question is whether Bethal was likely to keep at his residence the evidence of gang activity sought by police. The warrant first mentions handguns and ammunition. This court has observed that "individuals who own guns keep them at their homes." *United States v. Smith*, 182 F.3d 473, 480 (6th Cir. 1999) (citing *United States v. Shomo*, 786 F.2d 981, 984 (10th Cir. 1986); *United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975); *United States v. Rahn*, 511 F.2d 290, 293 (10th Cir. 1975)). The majority contends that the perpetrator of a shooting would be most likely to dispose of a gun, rather than store it in his home. However, the cases cited by the majority do not address the situation of one who is involved in a series of retaliatory shootings.

Under the circumstances here, Bethal was, if anything, more likely than the average gun owner to keep a gun and ammunition at home. As noted above, he was identified as an assailant in two drive-by shootings, which were part of a larger pattern of retaliatory gang shootings spanning five years. The shooters were thus themselves in danger of being shot by rival gang members. The affidavit states that at least one gang member did in fact carry a weapon with him in response to this danger. When the named informant forewarned Delion Burks, one of the targets of the shooting in which McCurley was killed, Burks responded that he "didn't care," because he was armed. Affidavit at 3.

The axiom that drug dealers are likely to keep evidence of drug dealing at home has been explained by this court as a "reasonable inference[] about where the evidence is likely to be kept," which an "issuing magistrate is entitled to draw." *Miggins*, 302 F.3d at 394 (quoting *McClellan*, 165 F.3d at 546). The inference that one who was both a perpetrator and a potential target of frequent shootings between rival gangs would be likely to keep a firearm and ammunition at his residence is,

28

if anything, stronger. Though a magistrate could reasonably infer that a drug dealer would keep drugs at home both because this would make them readily available for sale and more easily protected from theft, there certainly are drug dealers who operate only out of their cars, or out of their places of business. *See, e.g.*, *Woosley*, 361 F.3d at 925 (defendant conducted marijuana sales out of his place of business, an oil change shop); *United States v. Clemis*, 11 F.3d 597, 599, 602 (6th Cir. 1993) (defendant did not conduct drug transactions at his home, instead selling out of his car using drugs stored for him by third parties).

The desirability of having the relevant item close at hand is considerably stronger in the case of a gun, which not only may be needed on short notice to engage in criminal activity – here, drive-by shootings, rather than drug sales – but which may serve to protect the owner from attack, an attack which Bethal had good reason to fear. I would therefore hold that the magistrate had a substantial basis for concluding that Bethal was likely to keep weapons and ammunition related to the shootings at his home.

### 2. *Evidence of gang affiliation*

The warrant also authorized the officers to search for any "evidence of gang affiliation." Affidavit at 1. I concur with the majority's conclusion that the search for this evidence was impermissible because the warrant did not "particularly describ[e] . . . the persons or things to be seized." U.S. Const. amend. IV. This court in *United States v. Ables*, 167 F.3d 1021 (6th Cir. 1999), succinctly explained the parameters of the particularity requirement under Sixth Circuit precedent:

> General search warrants which fail to particularly describe the things to be searched for and seized "create a danger of unlimited discretion in the executing officer's determination of what is subject to seizure and a danger that items will be seized when the warrant refers to other items." "However, the degree of specificity required is flexible and will vary depending on the crime involved and the types of items

29

sought. 'Thus a description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit.'"

*Id.* at 1033-34 (6th Cir. 1999) (citations omitted) (quoting *United States v. Savoca*, 761 F.2d 292, 298-99 (6th Cir. 1985); *United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988) (quoting *United States v. Blum*, 753 F.2d 999, 1001 (11th Cir. 1985))). Moreover, as the Supreme Court observed in *Zurcher v. Stanford Daily*, 436 U.S. 547, 565 (1978), courts must apply the requirement of particularity "with particular exactitude when First Amendment interests would be endangered by the search." Here, the search for gang paraphernalia implicates the right of association. *Dawson v. Delaware*, 503 U.S. 159, 163 (1992) ("[T]he First Amendment protects an individual's right to join groups and associate with others holding similar beliefs.").

The *Ables* court explained that "broadly worded categories of items to be seized" are permissible under the Fourth Amendment if the category is "'delineated in part by an illustrative list of seizable items.'" *Id.* at 1034 (quoting *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990)). The fact that "the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category" is insufficient to create the forbidden "unlimited discretion in the executing officer" regarding what items to seize. *Id.* Thus, a search for gang paraphernalia would be permissible if the warrant first provided a list of examples, as did, for example, the warrant in *United States v. Jackson*, 67 F.3d 1359 (8th Cir. 1995), which listed:

> Any evidence of street gang membership o[r] affiliation with any street gang, including, but not limited to, any . . . objects or graffiti depicting gang members['] names, initials, logos, monikers, slogans, or containing mention of street gang membership, affiliation, activity, or identity; . . . and newspaper clippings tending to relate details or reference to any crime . . . .

*Id.* at 1366 n.1. In this case, the affidavit provided no modifiers for its authorization to search for

30

"evidence of gang affiliation," nor did it provide a "broadly worded category of items to be seized." Thus, with respect to the search for gang paraphernalia, I agree that the warrant did not satisfy the particularity requirement.

### 3. *Marijuana and other drugs*

The warrant also authorized the officers to search for marijuana and any other drugs. As the majority opinion notes, the affidavit does not provide information that defendant used or sold drugs. The strongest connection it provides between defendant and the drugs sought is that defendant was associated, as a fellow gang member and fellow shooter, with Kenneth Parker, whom the named informant knew to keep drugs and whom she called to purchase marijuana. The affidavit thus does not contain sufficient information to support a reasonable belief, based on "more than mere suspicion," that defendant possessed marijuana or other drugs. *Johnson*, 351 F.3d at 258 (quoting *Bennett*, 905 F.2d at 934).

## II. GOOD FAITH EXCEPTION

Even if the majority were correct in concluding that the affidavit did not provide probable cause to search for weapons and ammunition, the fruits of the search would still be admissible under the *Leon* good faith exception. The majority concludes that the warrant in this case was not entitled to good faith because it falls within the third situation in *Leon*: namely, "the affidavit at issue was 'so lacking in indicia of probable cause' that weapons or drugs could be seized from [Bethal's] residence 'that a belief in its existence [was] objectively unreasonable.'" Opinion at 16 (quoting *Laughton*, 409 F.3d at 748). I do not agree.

In *United States v. Laughton*, this court examined the Sixth Circuit's previous cases in which

31

the third-situation "so lacking" language was applied, and concluded that in each[15] case, "the issuing magistrate – as well as the reviewing court – was able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been, between the criminal activity at issue and the place to be searched." 409 F.3d at 750.

In *United States v. Washington*, 380 F.3d 236, 243 (6th Cir. 2004), the connection was that a car driven by an unidentified drug dealing suspect was regularly parked outside of the residence to be searched. In *Carpenter*, 360 F.3d at 593, the connection was that a field of marijuana plants grew near the residence searched and a road connected the residence and the field. In *Van Shutters*, 163 F.3d at 337, the connection was that the defendant was known to be involved in an ongoing scheme to purchase automobiles fraudulently, and the residence to be searched was described "with such particularity that a common sense inference is that the affiant visited the premises himself and presumably either observed [the defendant] in the residence, or determined through investigation that [the defendant] frequented the premises." Finally, in *United States v. Savoca*, 761 F.2d 292, 298 (6th Cir. 1985), the connection was that the defendant was observed entering the motel room to be searched.

In *Frazier*, which *Laughton* did not include in its survey of precedent, the court first examined the findings that good faith existed in *Van Shutters*, *Schultz*, and *Savoca*, and concluded, "The Frazier affidavit creates at least as strong a connection between the place to be searched and the evidence to be sought as the affidavits at issue in the foregoing cases." 423 F.3d at 537. The

---

[15]With the exception of *United States v. Schultz*, 14 F.3d 1093, 1096-98 (6th Cir. 1994), the holding of which the *Laughton* court found to be a "stretch of the limits of good faith" and therefore did not include in its distillation of the general principle from past cases. *Laughton*, 409 F.3d at 750.

court noted that, according to the affidavit, police had found drugs in the defendant's former residence, and that an officer could reasonably "infer that a drug dealer who kept drugs in his former home would also keep drugs in his current home," especially in view of "the Sixth Circuit cases cited in the affidavit, which stand for the proposition that, 'in the case of drug dealers, evidence is likely to be found where dealers reside.'" *Id.* (quoting *Newton*, 389 F.3d at 636). Thus, the *Frazier* court held that the "affidavit was not so lacking in probable cause as to render official belief in its existence entirely unreasonable." *Id.*

By contrast, the court in *Laughton* determined that the situation there was distinguishable from that in previous Sixth Circuit cases in which evidence was held admissible under the good faith exception. The court explained that the affidavit "did not even say explicitly that the confidential informant had purchased the narcotics from the [defendant]," and "the statement that the confidential informant had observed 'controlled substances at or in the residence or located on the person of [the defendant]' does not indicate where that residence was or when these observations were made, raising the possibility that the information was stale." 409 F.3d at 751. Thus, the court held that "[n]o reasonable officer" could have believed that the affidavit established probable cause. *Id.*

In *McPhearson*, decided just a few months ago, the warrant authorized search for "[i]llegal controlled substances, particularly crack cocaine, records, ledgers, tapes, electronic media and other items which memorialize drug trafficking or proceeds therefrom." 469 F.3d at 521. As in *Laughton*, the court held that the affidavit was sufficiently lacking in indicia of probable cause that it was objectively unreasonable for the executing officer to believe that probable cause existed. *Id.* at 527. The *McPhearson* court explained, "The only connection in the affidavit between 228 Shelby Street and drug trafficking was that Jackson police arrested McPhearson at his residence and found crack

33

cocaine in his pocket in a search incident to the arrest." *Id.* at 526. The affidavit did not state "that hallmarks of drug dealing had been witnessed at [the defendant's] home," or even "allege that [he] was involved in drug dealing"; "[n]or did the affidavit allege anything else tying McPhearson or his home to any criminal activity other than personal possession of crack cocaine (and the simple assault for which he was arrested)." *Id.* at 527.

The affidavit here is distinguishable from those in *Laughton* and *McPhearson*. In both of those cases, the affidavit lacked information that the defendant was actually known to be engaging in ongoing criminal activity; in *Laughton*, the affidavit did not identify the defendant himself as a seller of narcotics, and in *McPhearson*, the affidavit contained no information that the defendant sold cocaine rather than merely possessing it for personal use. In this case, the affidavit specified that Bethal was involved in ongoing gang activity, and witnesses identified him in connection with two drive-by shootings.

This information is comparable to that in the cases in which this court has found good faith. In fact, in this case, as in *Frazier*, the information in the affidavit establishes a stronger connection between Bethal's residence and the gang-related shootings than the information in *Washington*, *Carpenter*, *Van Shutters*, and *Savoca*. In those cases, the affidavits established the existence of ongoing criminal activity, but provided only inferential connections between the perpetrator involved in the activity and the residence to be searched. In this case, as in *Frazier*, the affidavit specified not only that the defendant was involved in ongoing criminal activity, but also that he resided in the house to be searched. It was reasonable for officers to believe that an affidavit that stated that Bethal resided at the place to be searched; that he was a member of a gang involved in a series of shootings; and that he himself had been implicated in two of the shootings, provided probable cause to believe

34

that guns and ammunition related to the shootings would be found at Bethal's home.

This conclusion is consistent with the Supreme Court's holding in *Leon* that

> when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope . . . there is [generally] no police illegality and thus nothing to deter.  It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.  In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.

468 U.S. at 920-21.  The magistrate addressing the motion to suppress in this case actually stated in his report, "It does not seem sound policy to require officers executing search warrants to engage in the type of analysis for which the magistrate judge required pen, paper, a qui[et] room and a strong cup of coffee."  Report and Recommendation at 11.  It is indeed unsound policy to expect the officers executing the warrant in this case to have questioned the magistrate judge's determination that probable cause existed to search for weapons, especially with regard to an affidavit which stated that Bethal was a gang member, provided witness accounts of Bethal's participation in gang-related shootings, and provided the address of his home.

Because I believe the affidavit in this case established probable cause to search Bethal's home for weapons and ammunition, and that even if it did not, the officers relied in good faith on the belief that the warrant authorized such a search, I believe it is not necessary to reach the question of whether the good faith exception also applies to the search for gang paraphernalia and drugs.  Rather, I would hold that the evidence found during the search of Bethal's home was admissible because it was found in plain view during a lawful search for weapons and ammunition.

### III.  PLAIN VIEW

Under the "plain view doctrine," officers may seize an object, even without a warrant to

35

search for it, (1) "if police are lawfully in a position from which they view [the] object," (2) "if its incriminating character is immediately apparent," and (3) "if the officers have a lawful right of access to the object." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). In the course of the search here, officers found marijuana in a kitchen drawer, marijuana and scales under a cushion in the living room, and cocaine in a Frosted Flakes box on top of the refrigerator, in a furnace closet, and in the dining room. All of the places in which the officers found cocaine were places in which a weapon or ammunition could have been. As the government notes in its reply brief, even a cereal box is large enough to conceal a weapon, and certainly ammunition.

Given the scope of the warrant, clearly the officers were intentionally searching for drugs. However, the plain view exception does not depend on whether the officers expected and intended to find drugs, provided that the drugs were found in places in which the weapons and ammunition could have been.[16] As the Supreme Court held in *Horton v. California*, 496 U.S. 128, 138 (1990),

> The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement.

Because the officers were already lawfully present in the house and investigating containers and closets to search for weapons and ammunition, they had a lawful right of access to the drugs they seized.

---

[16]Defendant also points out that the police used drug-sniffing dogs in their search. The Supreme Court has held that using drug-sniffing dogs does not transform an otherwise legal stop for a traffic infraction into an illegal one, because "any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interest.'" *Illinois v. Caballes*, 543 U.S. 405, 408 (2005) (quoting *United States v. Jacobsen*, 466 U.S. 109, 123 (1984)). That reasoning applies with equal force to an otherwise legal search.

The remaining requirement, that the "incriminating nature" of a piece of property be "immediately apparent" to the seizing officer, demands merely that the officer have "'probable cause to associate the property with criminal activity.'" *Texas v. Brown*, 460 U.S. 730, 741-42 (1983) (quoting *Payton v. New York*, 445 U.S. 573, 587 (1980)). In this case, on the basis of the facts available during the search – namely, the cocaine's visual appearance, along with any information conveyed by the drug-sniffing dogs – the officers believed that the items seized were crack cocaine. The record contains no suggestion that this belief was unwarranted. Therefore, the drugs in defendant's residence were properly seized under the plain view exception.

## IV. CONCLUSION

I would thus hold that the affidavit established probable cause to search for weapons and ammunition, and that the drugs and drug paraphernalia Bethal seeks to suppress were discovered in plain view during the course of a lawful search. Therefore, I would reverse the district court's denial of the motion to suppress.